**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1856**

DAMON WILSON,

Plaintiff - Appellant,

v.

PRINCE GEORGE'S COUNTY, MARYLAND; PFC GILL, ID #3361, Prince
George's County Police,

Defendants - Appellees.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
William Connelly, Magistrate Judge. (8:16-cv-00425-WGC)

Argued: March 22, 2018                                    Decided: June 18, 2018

Before GREGORY, Chief Judge, and KEENAN and FLOYD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Keenan
wrote the opinion, in which Chief Judge Gregory and Judge Floyd joined.

**ARGUED:** George Aubrey Harper, LAW OFFICES OF GEORGE HARPER, Upper
Marlboro, Maryland, for Appellant. Gessesse Teferi, PRINCE GEORGE'S COUNTY
OFFICE OF LAW, Upper Marlboro, Maryland, for Appellees. **ON BRIEF:** Jared M.
McCarthy, County Attorney, Andrew J. Murray, Deputy County Attorney, PRINCE
GEORGE'S COUNTY OFFICE OF LAW, Upper Marlboro, Maryland, for Appellees.

BARBARA MILANO KEENAN, Circuit Judge:

Damon Wilson was shot several times during an encounter with Officer Brendan Gill, a Prince George's County, Maryland, police officer. The incident occurred while Officer Gill was investigating an emergency call that Wilson had committed a burglary of his former girlfriend's dwelling and had assaulted her.

Wilson filed suit under 42 U.S.C. § 1983 against Officer Gill and Prince George's County (collectively, the defendants), alleging excessive force in violation of the Fourth Amendment. Wilson also alleged in his complaint that Officer Gill's conduct violated certain provisions of Maryland state law. The district court awarded summary judgment in the defendants' favor, holding that Officer Gill was entitled to qualified immunity, and that the County was not liable because no constitutional violation occurred.[1]

Upon our review, we hold that the district court erred in determining that Officer Gill's conduct did not violate Wilson's Fourth Amendment rights. Nevertheless, we affirm the district court's determination that Officer Gill is entitled to qualified immunity, because we hold that the constitutional violation was not clearly established when the incident occurred. We also affirm the court's judgment on the common law intentional infliction of emotional distress claim against Officer Gill and on the respondeat superior claim asserted against the County. However, because questions of immunity under state law remain, we vacate the court's award of summary judgment on Wilson's remaining

---

[1] Regarding the Section 1983 claim of excessive force, the district court held that Officer Gill's use of deadly force was objectively reasonable. Based on this holding, the court disposed of the Maryland state-law claims and awarded summary judgment in favor of the defendants on all claims.

state-law claims against Officer Gill, and remand those claims to the district court for further proceedings.

## I.

The parties largely agree on the events that occurred from the moment that Officer Gill first saw Wilson until the time that Officer Gill fired his weapon. We note any disputes of fact below.

On October 7, 2012, late in the afternoon, Wilson walked to the home of his former girlfriend, Mynia Johnson, because he wanted to see his two daughters who were in Johnson's care. After "knocking" and "banging" on Johnson's apartment door and receiving no response, Wilson began shouting that he wanted to see his children. As his anger increased, Wilson "kicked down" the front door of Johnson's apartment and walked inside, cursing and yelling at Johnson and one of her male guests.

After greeting one daughter, Wilson left the apartment. Johnson followed him outside and, during an argument that ensued, Wilson slapped Johnson. When Johnson threatened to call the police, Wilson attempted to take her phone, which fell into a drain.

Wilson left the area and walked to his brother's home. Because his brother was preoccupied with other matters, Wilson once again became angry, seized a pocket knife, and left his brother's home. Wilson walked back toward Johnson's apartment, intending to commit suicide in front of her so that she would blame herself for his death.

Meanwhile, Johnson had placed a telephone call to a 911 operator and had informed the operator that her ex-boyfriend had broken into her apartment and had

assaulted her. Officer Gill arrived at the apartment in response to the 911 call. Johnson showed Officer Gill the damaged apartment door, and informed him that Wilson had assaulted her after breaking into the apartment. Johnson later accompanied Officer Gill outside the building. As Officer Gill and Johnson were leaving the building, Johnson observed Wilson some distance away and identified him to Officer Gill, who directed Johnson to return to her apartment.[2]

Officer Gill began walking toward Wilson, attempting to engage him in a dialogue. Moments later, Wilson pulled a shiny object out of his pocket.[3] However, due to the distance between him and Wilson, Officer Gill was unable to identify the object.

Because Wilson continued walking in Officer Gill's direction, Officer Gill drew his service weapon and commanded Wilson between ten and fifteen times to drop the object in his hands, which object Officer Gill later identified as a knife. After Wilson failed to drop the knife, Officer Gill called for assistance on his radio. Wilson told Officer Gill to leave so that Wilson could "do what [he] wan[ted to] do." Wilson ignored Officer Gill's repeated command that Wilson drop the knife.

Instead, Wilson began directing obscene remarks at Johnson. Rather than drop the knife, Wilson took some steps forward, started "poking" himself with the knife, and "slit

---

[2] Johnson was present for the events that took place following Wilson's re-appearance at her apartment building. It is not clear whether she ignored Officer Gill's request completely or initially obliged but later came out of the building.

[3] It is undisputed that this object was the pocket knife Wilson took from his brother's home.

4

his throat." He then took a few more steps toward Officer Gill, and began "stab[bing]" and "poking" himself in the chest, which he testified caused him to "stumble[]" forward about four steps.

According to Wilson, at this point he was about 20 feet away from Officer Gill. Officer Gill, however, disputed Wilson's estimate and stated that he was between 10 and 15 feet away from Wilson. Johnson, who was standing about one or two feet behind Officer Gill, estimated that Wilson stopped eight feet away from Officer Gill. Although Officer Gill stated that Wilson "closed the distance" after stabbing himself in the chest, Officer Gill did not describe Wilson's movement with any particularity. However, sensing that Wilson was "too close," Officer Gill discharged his firearm five times, aiming for the center of Wilson's body. The record does not indicate whether Officer Gill issued a further warning to Wilson before shooting him. The record also lacks information regarding how quickly Officer Gill deployed the five shots.

Wilson suffered multiple gunshot wounds to the torso, but the record does not indicate which shots, or how many shots, hit Wilson. The gunshot wounds caused Wilson to fall to the ground. With the assistance of another police officer who arrived shortly after the shooting, Officer Gill rolled Wilson away from the knife, placed handcuffs on him, and began performing CPR.[4]

---

[4] Wilson's amended complaint alleged that he suffered permanent partial paralysis as a result of his gunshot injuries. However, there is no additional evidence in the record establishing the extent of Wilson's injuries.

In his complaint filed against Officer Gill and Prince George's County, Wilson asserted a claim under 42 U.S.C. § 1983 alleging excessive force in violation of the Fourth Amendment, as well as several claims under Maryland law.[5] The defendants filed a motion for summary judgment, contending that Officer Gill's conduct was reasonable and that he otherwise was immune from suit under the doctrine of qualified immunity. In granting the defendants' motion, the district court concluded that Officer Gill's use of force was objectively reasonable and, therefore, did not constitute excessive force. Based on this conclusion, the district court also dismissed Wilson's remaining claims against Officer Gill, as well as his claims against Prince George's County.[6] Wilson timely noted this appeal.

---

[5] The Maryland claims included causes of action under Articles 24 and 26 of the Maryland Declaration of Rights, and the common law torts of battery and intentional infliction of emotional distress. Wilson also originally brought a state-law claim for negligence against Officer Gill and a state-law claim of "unconstitutional custom and practice" against the County, but abandoned both claims in the district court. At oral argument before this Court, Wilson abandoned his appeal regarding his claim for intentional infliction of emotional distress.

[6] We conclude that Wilson has abandoned on appeal any challenge to the district court's dismissal of his claims against the County based on respondeat superior liability. Fed. R. App. P. 28(a)(8)(A) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them."); *see also, e.g.*, *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 n.7 (4th Cir. 2015). In his briefing to this Court, Wilson asserts that the district court erred in granting summary judgment to the defendants. However, Wilson's brief contains no reference to his claim against the County, much less offers any argument regarding the district court's dismissal of that particular claim. And importantly, Wilson fails to address how any determination that Officer Gill's conduct was unlawful would affect Wilson's claims against the County and to address potential issues of governmental immunity. Accordingly, by failing to raise this issue, Wilson has abandoned it.

## II.

### A.

We review de novo the district court's award of summary judgment. *Meyers v. Balt. Cty., Md.*, 713 F.3d 723, 730 (4th Cir. 2013). Summary judgment is appropriate only when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Meyers*, 713 F.3d at 730.

In conducting our review, we construe the evidence in the light most favorable to Wilson, the non-moving party. *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). We do not weigh the evidence or make credibility determinations. *See Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012) (stating that credibility determinations are not part of summary judgment proceedings); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) (assessing witness credibility and weighing evidence are functions of the jury, not of the trial judge ruling on motion for summary judgment).

### B.

Qualified immunity is a doctrine that "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine of qualified immunity protects from liability officers who commit constitutional violations, but whose conduct does not violate clearly established statutory or constitutional rights

7

known to a reasonable person. *Meyers*, 713 F.3d at 731. The burden of proving the affirmative defense of qualified immunity rests on the party seeking to invoke it. *Id.*

Our application of the qualified immunity doctrine is guided by the Supreme Court's analysis in *Saucier v. Katz*, 533 U.S. 194 (2001), later modified by the Court's decision in *Pearson*, 555 U.S. 223. Under the Court's two-step approach, we may first determine whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the officer's conduct violated the plaintiff's constitutional right. *Saucier*, 533 U.S. at 201. If this initial prong is satisfied, we evaluate whether the right at issue was "clearly established" at the time of the officer's conduct.[7] *Id.* Accordingly, even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit "if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) (citation and internal quotation marks omitted).

## C.

We first consider whether the facts alleged, taken in the light most favorable to Wilson, show that Officer Gill's conduct violated the Fourth Amendment. *Saucier*, 555 U.S. at 201. Wilson argues that Officer Gill's conduct of firing his weapon at Wilson

---

[7] Under *Pearson*, we need not conduct the two-step analysis in the sequence set forth in *Saucier*. 555 U.S. at 236. Nonetheless, we exercise our discretion in this case and conduct the qualified immunity analysis in the order provided by the Court in *Saucier*. *See id.*

constituted excessive force in violation of the Fourth Amendment. In response, Officer Gill contends that his use of deadly force was justified, because he reasonably feared for his safety and the safety of third parties present during his exchange with Wilson. Viewing the facts in the light most favorable to Wilson, we disagree with Officer Gill's argument.

The Fourth Amendment prohibits police officers from using excessive or unreasonable force in the course of making an arrest. *Graham v. Connor*, 490 U.S. 386, 395 (1989). We evaluate whether an officer has used excessive force based on a standard of "objective reasonableness." *Id.* at 396–97, 399. In applying this standard, we consider "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. An officer may not use deadly force against a person who "poses no immediate threat to the officer and no threat to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

To determine whether a need for force outweighed Wilson's Fourth Amendment rights, we examine each of the three *Graham* factors. We easily resolve the first and third factors. Regarding the first factor, Wilson does not dispute that he "kicked down" Johnson's door, entered her apartment without her consent, and assaulted her. It also is undisputed that Officer Gill knew that Wilson had committed these offenses before his encounter with Wilson. Accordingly, the first *Graham* factor weighs in Officer Gill's favor. *Graham*, 490 U.S. at 396.

9

The third *Graham* factor, whether Wilson resisted or attempted to evade arrest, favors Wilson. Officer Gill had not attempted to arrest Wilson, and Wilson was not trying to evade arrest when Officer Gill repeatedly shot Wilson. Thus, this factor weighs against Officer Gill's use of deadly force. *Id*.

The parties' arguments center on whether the second *Graham* factor supported the use of deadly force, namely, whether a reasonable officer could have perceived that Wilson "pose[d] an immediate threat to the safety of the officer[] or others." *Id*. Viewed in the light most favorable to Wilson, the facts show that Wilson did not threaten Officer Gill, Johnson, or any other individual present at the scene during the encounter. Wilson had a small knife in his hand and did not drop the knife when ordered to do so by Officer Gill. However, Wilson testified, and the defendants do not dispute, that Wilson never pointed the pocket knife in the direction of anyone but himself. Neither did Wilson move suddenly or act in a threatening manner toward Officer Gill or others.[8] Additionally, at the time Officer Gill discharged his weapon, Wilson had slit his own throat and had stabbed himself in his chest.

And finally, a key disputed fact further calls into question whether Officer Gill faced an immediate threat. The parties dispute the distance separating Officer Gill and Wilson at the time that Wilson "stumbled" forward and Officer Gill discharged his weapon. The estimates of the three people present ranged between eight feet and 20 feet.

---

[8] As noted previously, Wilson testified in his deposition that he "stumbled" a few steps toward Officer Gill. Drawing a reasonable inference in Wilson's favor, a jury could find such movement non-threatening.

10

A jury could determine that Wilson, standing 20 feet away and armed only with a pocket knife that he was using solely against himself, did not pose an immediate threat to Officer Gill or others, thereby rendering Officer Gill's use of lethal force unreasonable.

Under these alleged facts, therefore, a jury could conclude that Officer Gill violated Wilson's Fourth Amendment right to be free from excessive force. In reaching this conclusion, we emphasize that we do not make credibility determinations in resolving the first prong of the *Saucier* analysis.[9] *See Ray Commc'ns*, 673 F.3d at 305. Therefore, we conclude that the present record, when viewed in the light most favorable to Wilson, establishes that Officer Gill's use of force was not "objectively reasonable" and, thus, was excessive in violation of the Fourth Amendment. Accordingly, we hold that the district court erred in reaching a contrary conclusion.

D.

Having determined that Officer Gill's actions were an unconstitutional use of excessive force, we turn to consider the second step of the qualified immunity analysis, namely, whether Officer Gill's conduct violated a constitutional right that was clearly

---

[9] The district court relied on the report of the defendants' expert, Craig Dickerson, in reaching the determination that Officer Gill's use of force was reasonable and justified. Dickerson opined that a person armed with a knife and standing from an officer at a distance of 21 feet could rush toward, and "cut," an officer before the officer would be able to draw his weapon from its holster. Here, however, the facts are undisputed that Officer Gill already had drawn his weapon when Wilson was about 40 feet away from Gill. For this reason, we conclude that Dickerson's expert report is largely irrelevant to our determination of reasonableness. We also observe that it is for the jury to determine whether to credit Dickerson's opinion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

11

established at the time the conduct occurred.[10]  *Saucier*, 533 U.S. at 201.  A right is "clearly established" if it would be clear to a reasonable officer that the alleged conduct is unlawful.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In other words, the contours of the right must be "sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'"  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in the original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  To determine whether a right is clearly established, we assess whether the law has "been authoritatively decided by the Supreme Court,[11] the appropriate United States Court of Appeals, or the highest court of the state."  *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (citation omitted).

A right need not be recognized by a court in a specific factual context before such right may be considered "clearly established" for purposes of qualified immunity.  *See*

---

[10] The district court did not reach this step of the analysis, concluding that there was no Fourth Amendment violation.  Although we could exercise our discretion and first determine whether the right, as alleged, was clearly established without affirmatively holding that there was a violation of the Fourth Amendment when the evidence is construed in the light most favorable to Wilson, we think it is important to recognize the Fourth Amendment violation in this case in order "to further the development of constitutional precedent."  *Pearson*, 555 U.S. at 236.

[11] Supreme Court precedent offers little guidance regarding our determination whether the right at issue is clearly established because in many instances, the Court has declined to decide whether an officer's actions constituted a violation of the Fourth Amendment and instead has considered whether the right recognized by a court of appeals was clearly established.  *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (stating that "the Court need not, and does not, decide whether Kisela violated the Fourth Amendment . . . [f]or even assuming a Fourth Amendment violation occurred[,]" the officer's conduct did not violate clearly established law); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("We express no view as to the correctness of the Court of Appeals' decision on the constitutional question itself.").

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Buonocore v. Harris*, 65 F.3d 347, 356–57 (4th Cir. 1995). However, the Supreme Court has emphasized in recent years that courts are "not to define clearly established law at a high level of generality," and that "[s]pecificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015)). Thus, although we often have looked to the general rules articulated in *Graham*, 490 U.S. 395, and *Garner*, 471 U.S. 1, to hold that a right is clearly established, *see, e.g.*, *Clem v. Corbeau*, 284 F.3d 543, 553–54 (4th Cir. 2002), the Supreme Court has cautioned that we should do so only in "obvious case[s]" exhibiting violations of the core of the Fourth Amendment, *Kisela*, 138 S. Ct. at 1153 (citation omitted).

Defined at the level of specificity required by the Supreme Court, we ask here whether it was clearly established law in October 2012 that shooting an individual was an unconstitutional use of excessive force when: (1) the officer had probable cause to believe that the person had committed certain misdemeanors, one of which involved the use of force against another person; (2) the individual was standing about 20 feet from the officer holding a knife and using it to hurt himself, but was not threatening anyone or making any sudden movements; and (3) the individual had ignored the officer's repeated commands to drop the knife. Upon our review of relevant precedent, we hold that it was not clearly established law in October 2012 in the Supreme Court, this Circuit, or in the Court of Appeals of Maryland, that an officer shooting an individual under such circumstances would be engaging in an unconstitutional use of excessive force.

13

The cases we have examined are not sufficiently analogous to the present case to have placed Officer Gill on such notice. For example, when an individual was armed, we have held that the "mere possession" of a deadly weapon by the individual did not justify the use of deadly force. *See Cooper v. Sheehan*, 735 F.3d 153, 154, 159–60 (4th Cir. 2013) (reviewing the state of the law in 2007 and determining that the right was clearly established). However, when additional facts indicated that an armed person posed a threat of harm to the officers or others, we have held that the use of deadly force was objectively reasonable. *See Anderson v. Russell*, 247 F.3d 125, 128, 132 (4th Cir. 2001) (holding that officers were entitled to qualified immunity for shooting a man suspected of carrying a gun who initially complied with commands, but later lowered his hands and reached into his back left pocket toward a bulge under his clothing); *see also Slattery v. Rizzo*, 939 F.2d 213, 214–17 (4th Cir. 1991) (holding that the shooting of an individual, suspected of narcotics trafficking, was objectively reasonable when the suspect ignored commands to raise his hands and turned in the officers' direction with his hand partially closed around an object).

Here, Wilson was not shot solely because he had a deadly weapon in his possession. Rather, Wilson was suspected of committing two crimes, namely, breaking and entering and battery, and Officer Gill was aware of these crimes before his interaction with Wilson. Wilson also did not comply with Officer Gill's repeated commands to drop the knife he was holding. Thus, our decision in *Cooper* did not put Officer Gill on notice that shooting Wilson would be crossing a bright line in violation of

14

the Fourth Amendment. *See, e.g.*, *Anderson*, 247 F.3d at 128, 132; *Slattery*, 939 F.2d at 214–17.

Cases featuring officer interactions with suicidal individuals or individuals suffering from mental illness likewise are not dispositive. For example, in *Clem*, 284 F.3d at 545–46, two officers responded to a call by a woman explaining that her husband, Robert Clem, was suffering from dementia and various physical problems. Although Clem was not armed, he grew agitated and began acting erratically after the officers' arrival, causing the officers twice to administer pepper spray in an effort to subdue Clem. *Id.* at 547. Clem began "stomping" forward toward one of the officers with his hands open and in front of his body. *Id.* at 548. Without giving Clem any warning, one of the officers shot him. *Id.* We held that the officer's use of force was unreasonable in violation of the Fourth Amendment. *Id.* at 552.

In contrast, we held in *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), that an officer was entitled to qualified immunity for shooting an individual who at one point was armed with a knife, and had been drinking, throwing things, and cutting himself. *Id.* at 787. The individual had ignored several commands from the officers, had made threats to the officers and others, and had used the knife to slash at one of the officers through a window before one officer shot him. *Id.*

The conduct at issue here lies somewhere between the officer's unreasonable use of force in *Clem* and the officers' reasonable use of force in *Sigman*. Although *Clem* and *Sigman* both featured a mentally unstable individual, neither case is sufficiently analogous to the circumstances present here. Unlike in *Clem*, Wilson was armed and had

15

been engaged in criminal activity. And unlike in *Sigman*, Wilson never threatened others, either verbally or with the knife, during his interaction with Officer Gill. Therefore, our precedent at the time regarding the use of force on mentally ill individuals did not offer sufficient guidance to place "every reasonable offic[er]" in Officer Gill's position on notice that his conduct would violate the Fourth Amendment. *Ashcroft*, 563 U.S. at 741 (citation and internal quotation marks omitted).

Our review of Maryland Court of Appeals decisions affirms our conclusion that Officer Gill was not on notice regarding the constitutional violation resulting from his alleged conduct. Decisions by the Maryland Court of Appeals encompass cases that fairly could be deemed "obvious case[s]" of unreasonable uses of force. *See Barbre v. Pope*, 935 A.2d 699, 716 (Md. 2007) (holding that officer was not entitled to immunity under the Maryland Tort Claims Act for shooting an individual who was not intoxicated, incapacitated, or threatening the safety of the officer or others, and whose hands were raised in surrender). And decisions by that court have ratified an officer's use of deadly force against individuals who reasonably appear to be armed in dangerous circumstances. *See Richardson v. McGriff*, 762 A.2d 48, 49–50 (Md. 2000) (affirming jury verdict in favor of officer when officer shot the plaintiff after the officer's partner quickly opened the door to a closet in a dark kitchen, and officer shined flashlight inside, seeing the plaintiff holding and lowering into firing position what appeared to be a large weapon). However, the Court of Appeals of Maryland has not decided a case with facts sufficiently analogous to those present here such that Officer Gill was on notice that his conduct violated the Fourth Amendment.

16

A survey of other circuits' case law also illustrates the lack of clear consensus regarding violations of this nature. In some instances, courts have found excessive the use of deadly force against erratically behaving or suicidal individuals who are not otherwise threatening anyone and have not committed any violent acts. *See, e.g.*, *McKenney v. Mangino*, 873 F.3d 75, 79–80, 83 (1st Cir. 2017) (holding that it was excessive force for an officer to shoot a suicidal individual holding a gun in one hand and who ignored officer's commands but who did not point the gun at anyone or act in a threatening manner toward the officer); *Estate of Escobedo v. Bender*, 600 F.3d 770, 773, 780, 786 (7th Cir. 2010) (holding that the use of tear gas, flash bang devices, and ultimate shooting of an armed suicidal individual under the influence of drugs was excessive when the individual did not threaten anyone). But another out-of-circuit case can be construed as supporting Officer Gill's decision to use deadly force in this case. *See, e.g.*, *Elizondo v. Green*, 671 F.3d 506, 508, 510 (5th Cir. 2012) (holding that officer's shooting of a suicidal teenager not suspected of committing any crimes was reasonable when teenager refused orders to drop the knife in his hand and approached officer with the knife raised). Given the lack of "a consensus of cases of persuasive authority" from other jurisdictions, a reasonable officer in Officer Gill's position would not have known that his actions were unlawful. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538–39 (4th Cir. 2017) (citation omitted).

Ultimately, this case simply is not an "obvious" one, permitting us fairly to say that the decisions in *Garner* and *Graham*, on their own, clearly established the right at issue. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation and internal quotation marks

17

omitted). As of October 2012, our precedent shed some light on officer interactions with unarmed, mentally ill individuals, *see generally Clem*, 284 F.3d 543, and with armed, actively threatening, mentally unstable individuals, *see generally Sigman*, 161 F.3d 782. Our cases as of that time also addressed the reasonableness of deadly force against armed, but non-threatening individuals. *See generally Cooper*, 735 F.3d 153. And our decisions up to that date provided guidance to officers faced with armed individuals suspected of violent crimes. *See generally, e.g.*, *Anderson*, 247 F.3d 125; *Slattery*, 939 F.2d 213. However, as of October 2012, our precedent and the decisions of the Court of Appeals of Maryland fell short of providing sufficient notice to an officer to bar qualified immunity when the officer used deadly force against an armed, but otherwise non-threatening, self-harming individual suspected of committing misdemeanor offenses.

Accordingly, we hold that in October 2012, it was not clearly established that an officer would violate a suspect's Fourth Amendment right to be free from excessive force by shooting a person who: (1) was suspected of having committed a burglary and a battery; (2) was standing about 20 feet from the officer holding a knife, inflicting harm on himself and stumbling, but not threatening others or making sudden movements; and (3) was refusing to obey the officer's repeated commands to drop the knife at the time he was shot. We therefore conclude that Officer Gill is entitled to qualified immunity. We emphasize, however, that as of the date this opinion issues, law enforcement officers are now on notice that such conduct constitutes excessive force in violation of the Fourth Amendment.

18

## III.

Wilson's remaining claims against Officer Gill involve alleged violations of the Maryland Declaration of Rights Articles 24 and 26, and common law battery. The same standard applies to the Maryland Declaration of Rights claims as to claims asserted under the Fourth Amendment. *See Henry v. Purnell*, 652 F.3d 524, 536 (4th Cir. 2011) (stating that the court's conclusion that the defendant violated the plaintiff's Fourth Amendment rights meant that the defendant also violated the plaintiff's rights under Articles 24 and 26 of the Maryland constitution); *see also Richardson*, 762 A.2d at 56; *Okwa v. Harper*, 757 A.2d 118, 140–41 (Md. 2000). Thus, because we have concluded that Officer Gill used excessive force in violation of the Fourth Amendment, Officer Gill's conduct also violated the Maryland constitution. *See Henry*, 652 F.3d at 536. Additionally, Officer Gill's conduct, if proved, would constitute a battery under Maryland law. *See French v. Hines*, 957 A.2d 1000, 1037 (Md. Ct. Spec. App. 2008) (noting that "[t]o the extent that the officer uses excessive force in effectuating an arrest, the privilege [to commit a battery in the course of a legally justified arrest] is lost").

Because the district court erroneously concluded that Officer Gill's use of force was reasonable, the court did not address fully the question of immunity under Maryland law. "[M]indful that we are a court of review, not of first view," *Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) (citation omitted), we remand these state-law claims against Officer Gill for the district court to consider "in the first instance" whether Officer Gill is entitled to immunity under Maryland law, *Jennings v. University of North Carolina*, 482 F.3d 686, 702 (4th Cir. 2007).

19

IV.

For these reasons, we affirm the district court's award of summary judgment to Officer Gill on the Section 1983 claim of excessive force and the common law claim of intentional infliction of emotional distress. We also affirm the court's award of summary judgment to the County on the respondeat superior claim. We vacate the portion of the district court's order granting summary judgment to Officer Gill on the remaining state-law claims, and remand those claims for further proceedings consistent with this opinion.

*AFFIRMED IN PART;*
*VACATED IN PART;*
*AND REMANDED*