**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-2130**

───────────

DEBORAH BYGUM, Administratrix of the Estate of Eric Michell Young, deceased,

        Plaintiff – Appellee,

    v.

THE CITY OF MONTGOMERY; ROGER L. KING, individually as a member of the Montgomery Police Department,

        Defendants – Appellants,

    and

THE MONTGOMERY POLICE DEPARTMENT; CITY OF SMITHERS; JOHN MICHAEL HESS, SR., individually as a member of the Smithers Police Department,

        Defendants.

───────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., Senior District Judge.  (2:19-cv-00456)

───────────

Argued:  October 25, 2022                     Decided:  February 24, 2023

───────────

Before RICHARDSON and RUSHING, Circuit Judges, and Sherri A. LYDON, United States District Judge for the District of South Carolina, sitting by designation.

───────────

Affirmed by unpublished opinion.  Judge Lydon wrote the opinion, in which Judge Richardson and Judge Rushing joined.

**ARGUED:** Michael William Taylor, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellants. Stephen Paul New, NEW, TAYLOR & ASSOCIATES, Beckley, West Virginia, for Appellee. **ON BRIEF:** Charles R. Bailey, BAILEY & WYANT, PLLC, Charleston, West Virginia, for Appellants. Russell A. Williams, NEW, TAYLOR & ASSOCIATES, Beckley, West Virginia; Truman C. Griffith, WARNER LAW OFFICES, PLLC, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

LYDON, District Judge:

Shot four times by Officer Roger King, Eric Young died in the early morning hours of February 11, 2019, on a deserted West Virginia street. The shooting came on the heels of a tense foot pursuit spanning less than five minutes. King followed Young for several blocks, trying unsuccessfully to apprehend him for committing several non-violent misdemeanors such as shouting obscenities, attempting to break into a patrol car, trying to evade arrest, and obstruction. Officer King did not know if Young had a weapon. But he could not rule out the possibility Young was armed.

When Officer King opened fire, Young was empty-handed, stationary, and 50 feet away. With the first shot, Young started falling. Firing four more times while advancing on Young, Officer King fired the final shot when he had advanced to 25 feet from Young.

Whether true or not, we must view these facts in the plaintiff's favor as provided by the district court. A jury could of course credit Officer King's different story at trial. But that's for another day. The district court correctly noted it lacks that option (as do we) on Officer King's motion for summary judgment. And contrary to Appellants' arguments, the record here does not "blatantly contradict" the nonmoving party's version of events such that we cannot accept the facts as the district court viewed them. Because a jury could reasonably find Officer King violated Young's clearly established Fourth Amendment right to be free from excessive force, the district court properly denied King qualified immunity at this stage of the litigation. We affirm the district court's decision.

3

## I.    Background

Working the overnight shift alone on February 11, 2019, around 4:30 a.m., Officer King heard someone yelling obscenities and threatening to kill everyone.  King checked the live video feed of the alleyway behind the Montgomery Police Department station and saw a man, later identified as Eric Young, trying to open his locked police cruiser door. Seeming to head to another cruiser, Young disappeared from the video frame.  King notified police dispatch of Young's actions and left the station to investigate.

After searching, Officer King heard and then saw Young in a neighbor's car shed. King instructed Young to walk over to him.  Instead, Young walked away and Officer King followed.  Attempting to confront Young, King (6' 2" and between 180 to 185 pounds) told Young (5' 7" and 166 pounds) to get on the ground.  Young told Officer King to get out of his face and walked away.  Officer King again followed.

Throughout the pursuit, Young remained non-compliant—refusing to get on the ground as directed—and behaved erratically.  J.A. 642–44.  Young yelled "something about Satan and the Lord," J.A. 642.  When Officer King asked Young who he was, Young, in a voice King described as "demonic," said he was Satan.  J.A. 642.  Young also repeatedly flailed his arms and shirt, which Officer King said made him suspect aggression and the possibility that Young was reaching for a weapon in his waistband.[1]  J.A. 642.  He never saw a weapon on Young, though.  J.A. 642.

---

[1] In his statement provided to investigating officers less than three hours after the incident, King initially stated he "didn't see a weapon so [he] didn't really think anything of" Young's actions.  J.A. 42.  But Officer King later said he "couldn't tell if there was (Continued)

4

According to Officer King, Young stopped more than once to turn and "lunge" at him before turning around and walking away again. J.A. 642. During one of those instances, after Young turned and began walking toward Officer King, King fired his taser. Young appeared to rip the wires out before walking away again. With the taser failing to drop Young, King worried a substance was blocking Young's pain receptors. King notified police dispatch the taser was ineffective and continued to follow Young.

At some point after attempting to tase Young, Officer King drew his firearm in one hand while still carrying the taser in the other. J.A. 643. Though out of cartridges, King tried, to no avail, to convince Young to comply and get on the ground by threatening to tase him again. J.A. 643–44. Soon after, the encounter ended with Officer King firing five shots at Young, four of which hit and killed him. J.A. 399, 644.

After the shooting, Officer King stated he called for immediate medical assistance and unsuccessfully tried to save Young by applying pressure to his chest wound. At some point following the shooting, King discovered an unopened pocketknife clipped to Young's pocket. J.A. 643 n.4. Soon after, backup and paramedics arrived. Young was pronounced dead. J.A. 398. He died from multiple gunshot wounds perforating the heart and lungs. J.A. 399.

---

something in [Young's] waistline." J.A. 42. In his statement and during his deposition just over a year later, King further stated he could not rule out whether Young's picking up his shirt revealed he had a weapon. *See* J.A. 52 ("And then when he started flapping his shirt up and down, I thought he's gonna reach for a gun or he's gonna' have something so that's why I pulled my gun out in fear that he had something."); J.A. 60 (testifying "[i]f he's flailing his shirt, I don't know if he's not reaching for a weapon.").

Officer King and Deborah Bygum, Young's mother, disagree on the circumstances of the shooting, especially the positions, locations, and movements of King and Young. According to Officer King, Young was about 20 feet away when he turned to face King and charged him. J.A. 644. King stated he then shot Young when Young closed the distance between them to about 8 to 10 feet. J.A. 644. Officer King reported Young "said, just shoot me." J.A. 499, 644. King also stated he feared for his life and was concerned that if he backpedaled he could fall and lose his firearm because of a curb behind him. J.A. 644. After the first two shots, "[Young] just kept coming and then he turned and he turned around again and that's when [King] thought he was gonna' reach or something," and King shot him again. J.A. 645.

In his initial, transcribed statement to law enforcement King said that, after the last shot, Young fell on his back with his head toward King and his legs facing "the Kanawaha side." J.A. 645. During his deposition, however, King testified that, post-shooting, "[Young] stood completely straight up, turned completely around away from [King], and walked a good distance" before he "collapsed against the fence line." J.A. 645.

Following the incident, Ms. Bygum brought several federal and state-law claims in the U.S. District Court for the Southern District of West Virginia. She sued Officer King, the cities of Montgomery and Smithers, and Officer John Hess. Ms. Bygum retained a forensic expert, Dr. Jeremy J. Bauer, Ph.D., to suggest how the shooting unfolded. Based on Dr. Bauer's reconstruction of the shooting, Young's version of events would differ from King's if Young were here to tell it.

6

Dr. Bauer used 3D visualization software to recreate the shooting. He simulated the event following his consideration of the physical evidence (e.g., King's ejected bullet casings, Young's bullet wounds, the locations of two bullets that struck the house behind Young, Young's location and position of rest), Officer King's statement and deposition testimony, and the autopsy report. Based on the 3D digital simulation, Dr. Bauer concluded: Officer King fired the first shot, which hit Young in the left side of his chest, when Young was 50 feet away facing him; Young was falling and rotating to his right with respect to Officer King when he was struck by the next three bullets; Officer King fired the last shot at 25 feet away from Young; and Young was not charging Officer King when shots were fired. J.A. 646–50. Dr. Bauer otherwise "couldn't eliminate whether or not [Young] was moving forward or walking backward" during the shooting. J.A. 464. He also determined Officer King moved toward Young "in an approximate 42-foot leftward arc" during the shooting. J.A. 649–50.

Officer King and the City of Montgomery moved for summary judgment on, among other grounds, qualified immunity on Ms. Bygum's claim Officer King violated her son's Fourth Amendment right to be free from excessive force. In considering Officer King's summary judgment motion, the district court construed the facts in Ms. Bygum's favor and assumed true the following narrative:

> Officer King, who was noticeably larger than Young, opened fire while Young was 50 feet away, stationary, not wielding a weapon, and not known to be carrying a weapon. He then fired four more bullets while advancing 42 feet in a leftward arc towards Young, firing the last bullet 25 feet away from Young. Young began to fall to the ground after the first shot. Officer King had probable cause to believe Young had committed several non-violent

7

misdemeanors that night … and that Young was attempting to evade arrest by flight.  There is no evidence that anyone else was in the area at the time.

J.A. 654.

Against these facts, the district court decided a jury could find the shooting violated Young's clearly established Fourth Amendment right to be free from excessive force.  J.A. 651–59.  Officer King and the City of Montgomery now appeal the denial of their summary judgment motion, asking we find King is entitled to qualified immunity and reverse.  J.A. 671; Br. of Appellants at 47.  They argue Officer King did not violate Young's constitutional rights, Br. of Appellants at 15–33, and, if he did, such rights were not *clearly established*, Br. of Appellants at 34–47.

## II.    Jurisdiction

"A denial of summary judgment based on qualified immunity presents a narrow exception to the general rule that we cannot review a denial of summary judgment in an interlocutory appeal."  *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021).  Based on this limited exception, we have jurisdiction under 28 U.S.C. § 1291 over the district court's denial of qualified immunity here "to the extent it turns on an 'issue of law.'"  *Behrens v. Pelletier*, 516 U.S. 299, 311 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  But we may not review the district court's facts.  *See Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008) ("[W]e lack jurisdiction to re-weigh the evidence in the record to determine whether material factual disputes preclude summary disposition.").

8

### III.    Discussion

#### A. Legal Standards

An objective reasonableness standard governs our analysis of Bygum's Fourth Amendment excessive force claim. *Elliott v. Leavitt*, 99 F.3d 640, 642–43 (4th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 395–97 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). "When *deadly* force is used, we have a more specific test for objective reasonableness." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). "In those cases, we consider whether the hypothetical reasonable officer in that situation would have had 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)). Our review "must focus on the moment that deadly force was used" rather than "the whole episode." *Id.* "[T]he justification for deadly force can fall away in seconds." *Id.*

Taking care to "avoid hindsight bias," we must "try to place ourselves in the heat of the moment," *Stanton*, 25 F.4th at 233, mindful "that officers on the beat are not often afforded the luxury of armchair reflection," *Elliott*, 99 F.3d at 642. We must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Graham*, 490 U.S. at 396–97).

We consider the affirmative defense of qualified immunity against this substantive legal backdrop. "Qualified immunity balances two important interests—the need to hold

9

public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "When a qualified-immunity defense is raised, we apply a two-step test." *Stanton*, 25 F.4th at 233. "We must determine, first, whether the facts viewed in [Ms. Bygum's] favor make out a violation of [her son's] constitutional rights, and second, whether that violated right was clearly established at the time." *Id.* The burden of proof in this circuit is the plaintiff's on the first question and the defendants' on the second. *Id.* (citing *Henry v. Purnell*, 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007)).

When we review a district court's denial of summary judgment in the qualified immunity context, "our review is de novo." *See id.* at 234. "We view the evidence in the light most favorable to the plaintiff; we draw all reasonable inferences in h[er] favor; and we do not weigh the evidence or make credibility calls, even if we do not believe [s]he will win at trial." *Id.* Summary judgment is appropriate only if there is no genuine dispute of material fact and Officer King is entitled to qualified immunity as a matter of law. *See id.*

## B. Federal Qualified Immunity Analysis

### 1. Constitutional Violation

Viewing the facts most favorably to Ms. Bygum in the moments immediately preceding the use of lethal force, Officer King lacked probable cause to believe Young posed an immediate threat of serious physical harm to King or others. Other than Officer King and Young, the streets were empty. If Young threatened anyone, it would have been Officer King. But when Officer King opened fire, Young was standing 50 feet away,

stationary, empty-handed, and not known to be carrying a weapon. J.A. 654–55. After the first shot, Young started falling. Officer King advanced on Young in a 42-foot leftward arc as he kept shooting, firing the last shot when he reached 25 feet away from Young. Officer King had probable cause to suspect Young recently committed non-violent misdemeanors and attempted to evade arrest by flight. But at the time of the shooting, King lacked "probable cause to believe that [Young] pose[d] a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. at 11; *see also Wilson v. Prince George's Cnty.*, 893 F.3d 213, 220 (4th Cir. 2018) ("A jury could determine that [plaintiff], standing 20 feet away and armed only with a pocket knife that he was using solely against himself, did not pose an immediate threat to [the officer] or others, thereby rendering [the officer's] use of lethal force unreasonable").

In no way do we discount that Officer King may have reasonably believed Young was potentially dangerous. To be sure, the justification for deadly force can arise in seconds, just as it also "can fall away in seconds." *Stanton*, 25 F.4th at 233. And King had just observed Young commit several misdemeanors and behave erratically, yelling obscenities and talking about God and Satan. Besides this irregular behavior, Young kept flailing his arms and shirt during the confrontation, which made Officer King worried that Young was aggressive and possibly reaching for a weapon. Though Officer King did not see a weapon on Young, he couldn't rule it out. More than once, Young lunged at Officer King. And Young continually refused to comply with Officer King's lawful commands.

While there may have been times during this pursuit Officer King felt fearful, the moments immediately preceding the use of deadly force paint an objectively different

11

picture. Young was 50 feet away, not moving, and not known to be armed. That's when Officer King fired his first shot. As Young was falling from the impact of the bullet, Officer King advanced on Young, cutting the distance in half, while firing four more shots killing Young in the deserted street. In those vital moments, Officer King could not reasonably believe Young posed a threat of serious physical harm to King or others.

Appellants disagree. First of all, they argue, we can consider and reject the district court's factual findings as so "blatantly contradicted by the record' … that 'no reasonable jury could believe [them]," *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). Br. of Appellants at 18–24; Reply Br. of Appellants at 1–3. Appellants rely on *Scott v. Harris* to make that argument, though, and the facts before this court are very different.

Though *Scott* does address a Fourth Amendment excessive force claim, *Scott* involved "a videotape of the incident … that 'utterly discredited' the plaintiff's account, rendering it a 'visible fiction.'" *Harris*, 927 F.3d at 275 (quoting *Scott*, 550 U.S. at 380–81). The *Scott* Court instructed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

We have emphasized that "*Scott* is the exception, not the rule[,]" *Harris*, 927 F.3d at 276, and "does not 'abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting ... the plaintiff's version of the facts.'" *Id.* (quoting *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011)). *Scott*

12

applies "only when there is evidence—like the videotape in *Scott* itself—of undisputed authenticity that shows some material element of the plaintiff's account to be 'blatantly and demonstrably false.'" *Id.* (quoting *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3rd Cir. 2007)). This case lacks *Scott*'s "added wrinkle[,]" 550 U.S. at 378, of "evidence … of undisputed authenticity[,]" *Harris*, 927 F.3d at 276, "clearly contradict[ing] the version of the story told by [Ms. Bygum] and adopted by [the district court,]" *Scott*, 550 U.S. at 378. *See also Stanton*, 25 F.4th at 234 ("Courts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence.").

But hold on, argues Officer King: Even if we accept the district court's facts, his use of lethal force was still constitutional because he reasonably believed Young posed a serious threat of physical harm. Because Young was allegedly "reaching" or "grabbing at" his waistband, and in fact had a knife on him, Officer King argues his shooting was justified. We do not agree.

Let's start with the record. When Officer King opened fire, Young was empty-handed and stationary. J.A. 654–55. There is nothing in the record that suggests Young furtively moved "immediately prior to and at the very moment" Officer King fired his weapon.[2] *Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) (quoting *Greenidge v. Ruffin*,

---

[2] Officer King's statements regarding Young "flailing" his shirt do not expressly relate to the moments immediately preceding Officer King opening fire on Young. *See* J.A. 42, 52, 60, 217, 628.

13

927 F.2d 789, 792 (4th Cir. 1991)).  And the knife is irrelevant because Officer King was unaware of it until afterwards.

Now to the case law.  The cases cited by Officer King are factually distinct and do not help him.  For example, an officer shot a detainee who "was running in a crouched position" and "close behind" another deputy who was yelling "[t]he man has got a gun!" in *McLenagan v. Karnes*, 27 F.3d 1002, 1005 (4th Cir. 1994).  In *Anderson v. Russell*, an officer shot a suspect after (1) the officer was told by a citizen the suspect "appeared to have a gun[;]" (2) the officer perceived the suspect to have a gun "on his left side near his waist band[;]" and (3) the suspect "lowered [his hands], without explanation to the officers, in an attempt to reach into his back left pocket[,]" seemingly "reaching for the reported weapon."  247 F.3d 125, 128 (4th Cir. 2001).  When Officer King opened fire on Young, he had no such affirmative, reasonable belief that Young—who was standing still and empty-handed in the vacant street—had a weapon and was on the verge of using it against King or others.

Appellants' reliance on *Sigman v. Town of Chapel Hill* is similarly misplaced.  161 F.3d 782 (4th Cir. 1998).  The procedural flip of this case, *Sigman* involved the district court's grant of summary judgment for the officer on a Section 1983 excessive force claim.  But in *Sigman* "officers had *uncontroverted evidence* of a suspect's dangerousness and knew that the suspect was armed and was behaving violently within a residence." *Clem v. Corbeau*, 284 F.3d 543, 555 n.4 (4th Cir. 2002) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 292 (4th Cir. 2001)).  The *Sigman* suspect (1) had threatened to kill the officer and others present, *Sigman*, 161 F.3d at 784–85, 787; (2) threw objects and swung a knife at

14

the officer, *id.*; and (3) just before the officer shot him, had advanced to within 10 to 15 feet of the officer, knife in-hand, "in a threatening manner[,]" *id.* at 785. Young—a nonviolent, nonthreatening misdemeanor suspect standing still, empty-handed, and 50 feet away—hardly reminds us of the suspect in *Sigman*.

We thus conclude the district court correctly held a reasonable jury could find Officer King's actions here violated the Fourth Amendment.

### 2. Clearly Established Analysis

Because Ms. Bygum has shown Officer King violated her son's Fourth Amendment right to be free from excessive force, we turn to the second step of the qualified immunity framework, the clearly established analysis. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). We agree with the district court that Young's Fourth Amendment right not to be shot under the circumstances was clearly established.

As a threshold matter under this query, "we must first define the right at issue with specificity[,]" *Knibbs v. Momphard*, 30 F.4th 200, 223 (4th Cir. 2022), "keeping in mind that the Supreme Court has cautioned against defining the right at too 'high [a] level of generality,'" *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 539 (4th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[W]e have previously stated, clearly established 'includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked.'" *Wall v. Wade*, 741 F.3d 492, 502–03 (4th Cir. 2014) (quoting *Pritchett v. Alford,* 973 F.2d

15

307, 314 (4th Cir. 1992)).  There is no prerequisite of "a case directly on point[,]" *Kisela*, 138 S. Ct. at 1152 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)), as "the test is *not* whether 'the very action in question has previously been held unlawful,'" *Clem*, 284 F.3d at 555 (quoting *Anderson*, 483 U.S. at 640).

Instead, the standard is "whether pre-existing law makes the unlawfulness of an act 'apparent.'"  *See id.* (quoting *Anderson,* 483 U.S. at 640).  With this test in mind, we do not "assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense." *See Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019).  "In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Id.* As such, "defendants 'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning' that their conduct was unconstitutional." *Booker*, 855 F.3d at 538 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Here, "the question before us … is whether it was clearly established [by February 11, 2019] that shooting an individual was an unconstitutional use of excessive force," *Betton*, 942 F.3d at 194, when (1) the suspect was 50 feet away from the officer; (2) the suspect was facing the officer; (3) the suspect was stationary, not charging at or running toward the officer; (4) the suspect was not wielding or known to be carrying a weapon; (5) the officer had probable cause to believe the suspect had committed non-violent misdemeanors; (6) the suspect had behaved erratically; (7) the suspect was non-compliant;

16

(8) the suspect was attempting to evade arrest by flight; and (9) no other members of the public were present.

As of February 2019, two Fourth Circuit decisions provided "fair warning" that shooting a suspect under these circumstances "was unconstitutional." *Booker*, 855 F.3d at 546 (quoting *Hope*, 536 U.S. at 741). These cases did not "specifically adjudicate" Young's right not to be shot under the conditions here and differ factually. But they involve the court finding a suspect's right to be free from deadly force clearly established when the suspect posed a *greater* threat to the officer than Young did to Officer King. Thus, Young's right is "manifestly included within more general applications of the core constitutional principle invoked" in the findings of Fourth Amendment violations in these cases. *Wall*, 741 F.3d at 502–03 (quoting *Pritchett*, 973 F.2d at 314).

First, in *Clem v. Corbeau*, two officers responded to a call to assist a mentally ill man's family with getting him to see a doctor. 284 F.3d at 545–46. Like Officer King, the officers in *Clem* did not see anything indicating the presence of a weapon, *see id.* at 547, 551, though the officer who shot the man could not rule out that he was armed, *see id.* at 552, 555 n.3. Like Young, the man "became agitated[,]" *see id.* at 547, and non-lethal force (pepper spray) seemed ineffective, *id.* Similarly, the man was "grabbing," "flailing," and "waiving his arms around." *See id.* The man's hands were also "open" and weaponless. *See id.* at 547–48. Viewing the facts in the light most favorable to the man shot, the court found the constitutional right clearly established, as "a reasonable police officer in [the officer's] position would have perceived [the man] to be unarmed, blinded,

17

and stumbling, in no condition to pose any threat to the officer" when the officer fired three shots at close range down the hallway at the man. *Id.* at 548, 554.

Viewing our facts here, Young posed even less of a threat to Officer King than the man posed to the officer in *Clem*. Young was 50 feet away instead of at close range, stationary rather than moving toward the officer, and in an empty street instead of a confined hallway. If the man in *Clem*'s constitutional right was clearly established, it is "manifestly included" that Young's was as well.

Second, in *Wilson*, officers responded to a 911 call that a woman's ex-boyfriend had broken into her home and assaulted her. 893 F.3d at 216. When they arrived on the scene, officers located the man, who pulled out a knife that he refused to drop. *Id.* at 216–17. As the man approached the officer, he slit his own throat, and stabbed and poked himself in the chest, with the knife. *Id.* at 217. The suspect (who survived) said he was about 20 feet away from the officers when the officer shot him five times. *Id.*

The court stressed that following its 2018 opinion, officers were on notice that shooting a person violates that person's Fourth Amendment right to be free from excessive force when (1) the person was a burglary and battery suspect (2) the person "was standing about 20 feet from the officer holding a knife, inflicting harm on himself and stumbling, but not threatening others or making sudden movements; and (3) [the person] was refusing to obey the officer's repeated commands to drop the knife at the time he was shot." *Id.* at 224.

On each of these three elements, the *Wilson* suspect posed a greater threat to the officer than Young did to Officer King. Officers suspected the man in *Wilson* of burglary

18

and attacking someone—not nonviolent misdemeanors.  And the *Wilson* suspect was 20 feet away when the officer shot him—30 feet closer to the officer than Young to Officer King.  Further, the *Wilson* suspect visibly had a knife he refused to drop and was stabbing himself.  Because *Wilson* "manifestly included" Young's clearly established Fourth Amendment right not to be shot under the circumstances here, it would have been apparent to a reasonable officer on the scene that Officer King's use of deadly force against Young was unconstitutional.[3]

## IV.  Conclusion

For the reasons articulated above, we find a reasonable jury could credit Ms. Bygum's version of events, if proven at trial, over Officer King's story and determine Officer King's actions violated Young's clearly established Fourth Amendment right to be free from excessive force.  Without suggesting who is right or whose side a jury may ultimately believe, we therefore conclude Officer King was not entitled to qualified immunity.  Accordingly, the district court's order denying Officer King summary judgment on qualified immunity grounds with respect to plaintiff's 42 U.S.C. § 1983 excessive force claim is

AFFIRMED.

---

[3] The cases Appellants rely on do not help Officer King on the clearly established prong.  *See, e.g.*, *Sigman*, 161 F.3d at 784–85 (undisputedly dangerous suspect had threatened to kill the officer and others present and had advanced to 10 to 15 feet from the officer with a knife when shot); *see also McLenagan*, 27 F.3d at 1005–09 (officer shot detainee "running in a crouched position" and "close behind" another deputy yelling "[t]he man has got a gun!"); *see also Anderson*, 247 F.3d at 128–31 (suspect appeared to be "reaching" for a gun, disregarding officers' commands, when shot).

19