**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 17-7308

HERMAN HARRIS,

        Plaintiff - Appellant,

    v.

ZACHARY PITTMAN, Fayetteville Police Department,

        Defendant - Appellee,

    and

MOOSE BUTLER,

        Defendant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, Chief District Judge. (5:13-ct-03087-BO)

Argued: January 30, 2019                        Decided: June 18, 2019

Before WILKINSON, WYNN, and HARRIS, Circuit Judges.

Reversed and remanded by published opinion. Judge Harris wrote the opinion, in which Judge Wynn joined. Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Rafael Reyneri, COVINGTON & BURLING LLP, Washington, D.C., for Appellant. Donald Brandon Christian, CITY OF FAYETTEVILLE, Fayetteville, North Carolina, for Appellee. **ON BRIEF:** Richard Rainey, COVINGTON & BURLING

LLP, Washington, D.C., for Appellant.  James C. Thornton, CRANFILL SUMNER & HARTZOG LLP, Raleigh, North Carolina, for Appellee.

PAMELA HARRIS, Circuit Judge:

This is the second time we have addressed this § 1983 action, in which plaintiff Herman Harris alleges that police officer Zachary Pittman used excessive force in arresting him after an intense hand-to-hand struggle between the men. Previously, we reversed the district court's grant of summary judgment to Officer Pittman on qualified immunity grounds, finding that the district court erred when it failed to construe the evidence in the light most favorable to Harris. On remand, the district court again held that Pittman is entitled to qualified immunity as a matter of law.

We must reverse for a second time. The district court again based its qualified immunity holding on inferences drawn in favor of Officer Pittman. But as we held in our prior decision, the court was obligated to construe the salient facts in the light most favorable to Harris, as the party opposing summary judgment. And on Harris's version of the disputed facts, construed in the light most favorable to him, a reasonable jury could find a violation of Harris's clearly established Fourth Amendment rights. Because there remain genuine factual disputes bearing on Pittman's entitlement to qualified immunity, the district court erred in awarding summary judgment to Pittman.

## I.

### A.

This case centers around Officer Pittman's use of deadly force at the conclusion of a violent, hand-to-hand struggle between Pittman and Harris. The parties agree that Pittman shot Harris several times at point-blank range. And Harris does not dispute that

3

Pittman's first shot, into his chest, was justified by the intensity of the struggle and the threat he posed to Pittman's safety. As we have held, however, even where an initial use of deadly force is reasonable, the repeated use of force may be constitutionally excessive if circumstances change in a material way. *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005). And so the critical disagreement here is over the precise circumstances under which Pittman fired his final shots at Harris: whether, as Pittman says, a deadly struggle was ongoing, with Harris standing over Pittman, as Pittman fired; or whether, as Harris has it, the struggle was over, with Harris lying on the ground, wounded and unarmed, when Pittman stood above him and fired two more shots into his chest and leg.

The events leading up to this confrontation began when a Fayetteville, North Carolina police officer noticed a vehicle that had been reported stolen the previous night. The officer alerted other officers in the area to be on the lookout for the suspects involved, described as "early- to mid-teenage black males." J.A. 237–38. One nearby officer spotted Harris, a then-38-year-old black male whom the parties now agree had no role in the reported vehicle theft. Nonetheless, the officer "noticed that [Harris] was on his cell phone, walking at a fast pace, sweating excessively and appeared to be nervous." J.A. 245. Further, according to the officer, Harris "avoided eye contact and had rapid head and hand movement." *Id.* Based on this information, the officer determined that Harris was behaving suspiciously and turned his vehicle to pursue Harris.

Harris began to run, and as he fled, he came into Officer Pittman's line of sight. Pittman got out of his squad car and gave chase. According to Pittman, as he gained on Harris, he threatened to use his taser on Harris in an attempt to stop his flight. Harris

4

continued running, and Pittman eventually caught him at the edge of a wooded bramble and tackled him down a steep incline into some shrubs.

When the men came to a stop, a hand-to-hand struggle ensued. Pittman attempted to use his taser against Harris, and alleges that Harris tried to use the taser against him as well. Both times, however, the men were able to deflect the taser's aim, and though each felt the partial effects of the discharges, Pittman "could not use the [t]aser to [his] advantage" to effectuate Harris's arrest and secure his own safety. J.A. 241. The struggle continued to escalate, and though the parties dispute who first reached for Pittman's firearm, the two men fought for control of the gun. The gun fired while in Pittman's holster, and the bullet struck Harris's right ring finger, severing part of it.

According to Pittman, Harris then wrestled the gun away from Pittman, pointed it at Pittman's face, and pulled the trigger. But for a firearm malfunction, Pittman says, Harris would have killed him. The gun did not go off, however, and Pittman regained control of the weapon. Pittman then fired the first of his intentional shots at Harris, striking him in the chest. As noted above, Harris does not argue that Pittman lacked justification for this initial use of deadly force.

Thus, while Harris disputes some of the preceding details, it is at this point that the parties' narratives diverge in ways most significant to this appeal. There remains some overlap in their accounts: The parties agree that Pittman now had full control over his weapon, leaving Harris unarmed; Pittman does not contend either that Harris was armed or that he mistakenly believed him to be armed. And they agree that Pittman continued to fire his gun at Harris. But the parties vigorously dispute the factual circumstances

5

directly attendant to those final shots, which form the basis for Harris's excessive force claim.

On Pittman's account, there was no material change in circumstances as he fired at Harris. According to Pittman, once he regained control of his firearm, he was lying on the ground and saw Harris standing a few feet away. Fearing another attack, Pittman "fired [his] weapon until [] Harris fell," consistent with training that had taught him to fire until a perceived threat is eliminated. J.A. 242. Although Pittman does not specify how many shots he fired, he is adamant that he fired each at roughly the same time and under the same circumstances: Pittman was on the ground, and Harris was on his feet, presenting an imminent threat to Pittman's life and safety.

On Harris's account, by contrast, Pittman fired three shots, and the circumstances changed significantly between the first shot and the second two. According to Harris, Pittman's initial shot, which "hit[] him in his right chest area," had "lift[ed] him off his feet," J.A. 379, so that he was lying on the ground badly wounded. Pittman then got to his feet and stood over Harris, who "was not trying to escape, nor . . . showing any further resistance." J.A. 329. And then, Harris says, while he was lying bleeding and subdued on the ground, Pittman shot him twice more, once in the chest and then in the back of his left leg. The final shot struck Harris in the left buttock, broke his femur on the way through his body, and exited his body near his groin, suggesting that Harris rolled onto his stomach before Pittman fired for the last time.

**B.**

6

Harris initiated this § 1983 action against Pittman, proceeding pro se – that is, without the assistance of counsel – and alleging that Pittman used excessive force against him in violation of his Fourth Amendment rights. Pittman moved for summary judgment, asserting qualified immunity as a defense.

The district court granted Pittman's motion for summary judgment. As the district court explained, a defendant like Pittman is entitled to qualified immunity at the summary judgment stage if (1) the facts, viewed in the light most favorable to the plaintiff – here, Harris – do not demonstrate a violation of the plaintiff's constitutional rights; or (2) they do, but the relevant constitutional right was not clearly established at the time of the alleged violation. J.A. 206–07; *see also Waterman*, 393 F.3d at 476. Focusing on the first prong, the district court held that Pittman had not violated Harris's Fourth Amendment rights because Pittman's use of force was objectively reasonable as a matter of law.

In making that determination, the district court appeared to credit Pittman's account of the immediate circumstances under which he fired at Harris. As the district court described the relevant facts, Pittman regained control of his gun while he was lying on the ground, and then, having turned on his gun light, saw "Harris *standing* a few feet from him." J.A. 208 (emphasis added). Able to see only a "partial silhouette" of Harris, the district court went on, "Pittman believed that Harris was still a threat and his life was in danger." *Id.* Still on the ground, Pittman fired at the upright Harris and then, when Harris did not fall, continued to fire. Under those circumstances, the district court

7

concluded, no genuine dispute of material fact remained as to whether Pittman's use of force had been objectively reasonable under the Fourth Amendment.

Harris appealed, and we reversed. *See Harris v. Pittman*, 668 F. App'x 486 (4th Cir. 2016) (per curiam). The parties' "different versions of the salient facts," we held, gave rise to a material dispute over "what occurred when Pittman fired the final shots at Harris," including "whether Harris was standing or lying down." *Id.* at 487. Instead of resolving that dispute in Pittman's favor at the summary judgment stage, the district court was required to view the facts "in the light most favorable" to Harris. *Id.* Its failure to do so meant that the district court had not answered the critical question in the case: "whether, construing the facts in the light most favorable to Harris (i.e., Harris was lying on the ground when Pittman, still on top of him, fired the final shots), a reasonable officer would have probable cause to believe that Harris posed a significant threat of death or serious physical injury to the officer or others." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 3, 11–12 (1985) (describing Fourth Amendment standard for use of deadly force)). Accordingly, we vacated the grant of summary judgment and remanded with instructions "to determine, in the first instance, if construing the salient facts in the light most favorable to Harris, Pittman is entitled to qualified immunity." *Id.*

On remand, the district court again granted summary judgment to Pittman. This time, the court assumed that Pittman was standing over Harris when he fired the final shots. But even under those circumstances, the court held, his use of force was objectively reasonable as a matter of law. That the final shots were (by assumption) fired while Pittman was standing over Harris, the court reasoned, did not render them

8

unreasonable, given record evidence "that the shots were fired in rapid succession" and the preceding "relentless" attacks on Pittman by Harris, "even after [Harris was] struck by a taser." J.A. 393. And "[n]otably," the court concluded, "from the location of [Harris's] wounds, it appears that Pittman intended his shots only to disable [Harris]." *Id.*

Because Harris's own assertions did not establish a constitutional violation, the court held, Pittman was entitled to summary judgment under the first prong of the qualified immunity analysis. And in any event, the court continued, Pittman would be entitled to summary judgment under the second prong, because even if Harris could establish a violation of his Fourth Amendment right to be free of excessive force, that right was not clearly established with the requisite specificity at the time of the incident.

Harris timely noticed this appeal and again submitted uncounseled and informal briefing. We appointed counsel for Harris, who filed a brief on his behalf, and heard argument in the case.

## II.

On appeal, Harris argues that the district court erred by failing to follow this court's mandate and construe the evidence in the light most favorable to him on summary judgment. According to Harris, when viewed under the proper standard – construed in the light most favorable to him, with all reasonable inferences drawn in his favor – the record evidence would allow a reasonable jury to find that Pittman violated his clearly established constitutional rights. We agree.

9

Our holding is a narrow one. How an ultimate fact-finder might weigh and evaluate the parties' accounts and the other evidence in this case is not the question before us. The only issue on appeal is whether, at this early stage of the litigation and before a jury has had a chance to assess witness credibility and other evidentiary issues, it can be said that Pittman is entitled to qualified immunity as a matter of law. We conclude that genuine factual disputes bearing directly on Pittman's qualified immunity defense preclude the award of summary judgment, and therefore reverse the judgment of the district court.

## A.

Harris alleges a violation of his rights under the Fourth Amendment, which "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest. *Clem v. Corbeau*, 284 F.3d 543, 549–50 (4th Cir. 2002).

To determine whether an officer's use of force is excessive, we apply a "standard of objective reasonableness." *Id.* at 550. In this case, the parties agree that Pittman used deadly force against Harris when he fired repeatedly at Harris at point-blank range. Because the "intrusiveness of a seizure by means of deadly force is unmatched," a police officer may use deadly force only if the officer has "probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Waterman*, 393 F.3d at 477 (quoting *Garner*, 471 U.S. at 9, 11).

10

Harris does not dispute that this standard was satisfied when Pittman fired his first intentional shot at him, during an intense hand-to-hand struggle. Instead, Harris focuses on Pittman's final two shots, invoking case law establishing that even when an initial use of force is objectively reasonable, subsequent applications of force – even moments later – may not be. Because the inquiry into excessiveness turns on "the information possessed by the officer at the moment that force is employed," "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Id.* at 481 (citing *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996)). It follows, we held in *Brockington v. Boykins*, 637 F.3d 503, 507–08 (4th Cir. 2011), that even where an officer originally was justified in shooting at a suspect, the use of deadly force became objectively unreasonable once the suspect, disabled by the officer's initial shots, fell to the ground.

**B.**

With that legal standard in mind, we turn to the district court's treatment of the record in evaluating Pittman's motion for summary judgment. It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant – here, Harris – and to draw all reasonable inferences in his favor. *See Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). Importantly, that obligation does not give way to a court's doubts about the credibility of a nonmoving party's account. A district court may not "weigh the evidence or make credibility determinations," *id.* at 569, and is not in a position "to disregard stories that seem hard to believe," *Gray v. Spillman*, 925 F.3d 90, 95 (4th Cir.

11

1991).  Instead, the district court was required to construe the record evidence favorably to Harris, even if it did not believe that Harris ultimately would prevail at trial.  *See Jacobs*, 780 F.3d at 568 (district court may not grant summary judgment "merely because the court believes that the movant will prevail if the action is tried on the merits" (internal quotation marks omitted)).

We review de novo the district court's grant of summary judgment.  *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).  And here, we analyze the district court's decision not only against the record, but also for conformity to the mandate we issued in our earlier ruling in this case.  *See Doe v. Chao*, 511 F.3d 461, 464–65 (4th Cir. 2007).  In that earlier ruling, we identified a genuine and material dispute of fact as to "what occurred when Pittman fired the final shots at Harris," particularly "whether Harris was standing or lying down."  *Harris*, 668 F. App'x at 487.  It followed, we held, that the district court was obliged to accept Harris's version of events – "i.e., Harris was lying on the ground when Pittman, still on top of him, fired the final shots" – and consider whether, on those facts, a "reasonable officer would have probable cause to believe that Harris posed a significant threat of death or serious physical injury to the officer or others."  *Id.* (citing *Garner*, 471 U.S. at 3, 11–12).

1.

Consistent with our instruction, the district court on remand specifically addressed Harris's allegation that at the time of the final two shots, Pittman was standing above

12

Harris, who was lying wounded on the ground.[1]  Even under those circumstances, the district court concluded, there could be no Fourth Amendment violation:  As a matter of law, Pittman reasonably believed that Harris remained a threat to his safety, satisfying the *Garner* standard.  In reaching that determination, however, the district court improperly drew inferences in favor of Pittman, rather than Harris, and appears to have misapprehended both our mandate and our circuit's governing law.

We may dispense quickly with one of the three rationales offered by the district court for its conclusion:  that "from the location of plaintiff's wounds, it appears that Pittman intended his shots only to disable plaintiff," J.A. 393.  Harris suffered four gunshot wounds, three of which were inflicted intentionally:  two wounds to Harris's chest, and a third to the back of his leg that broke his femur and narrowly missed his femoral artery.  To conclude that this pattern of wounds reflects an intent "only to disable" is to draw an inference – and a heroic one – in favor of Pittman, not Harris, in violation of basic summary judgment principles.  And it has nothing to do with the legal question of whether Pittman's final two shots were justified.  Whatever his motives, Pittman used deadly force when he fired his gun at Harris; what matters is whether he had objectively reasonable grounds for doing so under *Garner*, not whether he expected or

---

[1] The district court referred to the final "shot," singular, J.A. 393, while Harris's account alleges that, of the three shots Pittman intentionally fired at Harris, both the second and third were fired at him after he had fallen to the ground.  *See Harris*, 668 F. App'x at 487 (referring to final "shots," plural).  Nothing in the district court's analysis, however, appears to turn on this distinction.

hoped that Harris could survive the shooting. *See Elliott*, 99 F.3d at 642 ("intent or motivation of the officer is irrelevant" in evaluating use of deadly force).

In holding that Pittman's final shots were justified even if Harris by then was lying on the ground wounded, the district court also relied on a finding that "the record reflects that the shots were fired in rapid succession." J.A. 393. In support, the court cited the affidavits of two Fayetteville police officers, recounting what they were told by two auditory witnesses – witnesses who did not see the events in question but heard the gunshots. Both witnesses, according to the officers, heard substantially the same thing: a gunshot (presumably the accidental discharge during the struggle for Pittman's holstered gun), followed "[a]fter about a 30-second pause" by "three more gun shots and someone yelling," J.A. 252 – or, for the other witness, followed "[a] few seconds later" by additional shots, J.A. 259–60.

The district court did not explain what significance it was attaching to its determination that Pittman fired his shots at Harris in "rapid succession." One possibility is that the court perceived an inconsistency between three shots fired in "rapid succession" and Harris's version of events, in which there was time between the first and second of these shots for Harris to fall to the ground and Pittman to get to his feet. But that, too, would require drawing inferences in Pittman's favor and against Harris. The witness statements focus on the temporal gap between the first (accidental) discharge and the subsequent (intentional) firings; they do not specify the time elapsed between each of the final three shots. And while the statements do suggest that those shots were clustered together in relation to the previous discharge, that does not foreclose the possibility that

14

there still was time enough between the first two intentional shots for Harris to fall and Pittman to regain his footing. Only by drawing inferences against Harris rather than in his favor could the court have found a conflict between the witness statements and Harris's account.[2]

Moreover, the question before the district court, as laid out expressly in our mandate, was whether, assuming Harris's version of events – specifically, that "Harris was lying on the ground when Pittman, still on top of him, fired the final shots" – those final shots were justified under the Fourth Amendment. *Harris*, 668 F. App'x at 487. Pointing to record evidence that might, construed in Pittman's favor, suggest that Pittman and not Harris was lying on the ground cannot answer that question, and it is not responsive to the mandate from our prior decision. *See Doe*, 511 F.3d at 465 (district court may not reconsider questions resolved by an appellate court's mandate).

The other possibility is that the district court reasoned that because the shots were fired in "rapid succession," they should be analyzed collectively and as one sequence, so that the conceded justification for the first shot would extend to the final two as well. But any such rationale would be inconsistent with our case law, which rejects precisely this approach and instead insists that "the reasonableness of force employed can turn on a

---

[2] All of this assumes, of course, the admissibility and credibility of the affidavits and the second-hand accounts they contain. An affidavit used to support or oppose a motion for summary judgment generally "must be made on personal knowledge," Fed. R. Civ. P. 56(c)(4), which these affidavits – consisting of police officers' summaries of witness statements – are not. And even if there were an actual conflict between admissible affidavits and Harris's account, it would be up to a fact-finder to assess credibility and weigh the evidence.

change of circumstances during an encounter lasting only a few seconds," *Waterman*, 393 F.3d at 481 (rejecting argument that reviewing subsequent shots separately from initial shot draws "artificial divisions in the sequence of events" (internal quotation marks omitted)). That shots are fired in "rapid succession," in other words, is not enough to establish, as a matter of law, that the risk of physical harm to Pittman that supported the first shot still existed at the time of the second and third – when, by hypothesis, Harris, having been struck in the chest by the first shot, was lying on the ground wounded and unarmed. *See Brockington*, 637 F.3d at 507 ("pars[ing]" sequence of shots and finding that safety risk that justified initial shots did not justify subsequent shots once suspect, wounded, had fallen to ground).

That leaves the district court's third and last rationale: that Pittman's final shots were reasonable as a matter of law even if he was standing over a prone Harris because Harris's attack on Pittman had been "relentless," continuing "after [Harris] was struck by a taser on two occasions." J.A. 393. Here, the district court appears to be reasoning that Harris demonstrated unusual persistence and endurance in his struggle with Pittman, making it reasonable for Pittman to believe that Harris remained a threat while lying on the ground wounded and unarmed, with Pittman above him holding a gun. *See* J.A. 393–94 ("[T]he record reflects that Pittman reasonably believed that plaintiff would continue to attack Pittman at all costs."). But even if a jury could draw this inference in Pittman's favor, the district court on summary judgment could not. *See Jacobs*, 780 F.3d at 568 (district court must draw all reasonable inferences in favor of nonmovant at summary judgment stage).

16

On Harris's account, which has him "lift[ed] . . . off his feet" and thrown to the ground by Pittman's first shot to his chest, J.A. 379, a reasonable jury could find that it would have been evident to Pittman, at least once he regained his footing and stood over Harris with his gun, that Harris was badly wounded and subdued. Pittman acknowledges turning on his gun light before opening fire, suggesting he had the opportunity to observe Harris's condition as he fired the final shots. Nor, again, does Pittman allege that he believed Harris to be armed at that point. And viewed most favorably to Harris, the evidence suggests that by the time of the final shot – which, he says, struck him in the left buttock and exited his body near his groin – Harris had rolled over and was lying with his face in the ground. Against all of this, the district court seems to have concluded that Harris showed himself to be uniquely threatening when he proved impervious to two prior taser strikes – but that is yet another inference improperly drawn in Pittman's favor, given Pittman's own account of finding himself unable to deploy his taser effectively against Harris. On this point, in other words, the district court again erred by drawing inferences in favor of Pittman, when the opposite is required on summary judgment.

2.

On appeal, Pittman does not defend the district court's answer to the question we posed in our mandate: "whether, construing the facts in the light most favorable to Harris (i.e., Harris was lying on the ground when Pittman, still on top of him, fired the final shots), a reasonable officer would have probable cause to believe that Harris posed a significant threat of death or serious physical injury," *Harris*, 668 F. App'x at 487. Instead, he rejects the premise – and with it, our mandate – arguing for the first time that

17

Harris's account should *not* be credited on summary judgment, primarily because it is "blatantly contradicted by the record" and thus fails to create a genuine dispute of fact under *Scott v. Harris*, 550 U.S. 372, 380 (2007). Even if this argument were not foreclosed by the mandate rule that precluded Pittman from raising it before the district court, *see Doe*, 511 F.3d at 465, we would find it unpersuasive.

In *Scott v. Harris*, which also involved a Fourth Amendment excessive force claim, the Supreme Court was faced with a videotape of the incident in question that "utterly discredited" the plaintiff's account, rendering it a "visible fiction." 550 U.S. at 380–81. As between a videotape of undisputed authenticity, *id.* at 378, and the plaintiff's story, the Court held, the videotape should prevail. Where the nonmoving plaintiff's account is "blatantly contradicted by the record" so that "no reasonable jury could believe it," it should not be adopted by a court ruling on a motion for summary judgment. *Id.* at 380.

As we have clarified, *Scott* is the exception, not the rule. It does not "abrogate the proper summary judgment analysis, which in qualified immunity cases 'usually means adopting . . . the plaintiff's version of the facts.'" *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott*, 550 U.S. at 378). That standard continues to apply in the face of "documentary evidence" that lends support to a government official's account of events, *id.*, or even makes it "unlikely" that the plaintiff's account is true, *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (holding that *Scott* does not apply to photographs rendering plaintiff's account "unlikely"). Summary judgment is proper under *Scott* only when there is evidence – like

18

the videotape in *Scott* itself – of undisputed authenticity that shows some material element of the plaintiff's account to be "blatantly and demonstrably false." *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to evidence in form of police photographs that fail to depict "all of the defendant's conduct and all of the necessary context"); *see also Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

The *Scott* principle has no application here. That is perhaps clearest with respect to Pittman's reliance on police officer affidavits recounting the statements of auditory witnesses to the shootings. According to Pittman, those statements, because they fail to describe a "meaningful pause" between shots, "blatantly contradict" Harris's account, just as the video in *Scott v. Harris* "blatantly contradicted" the plaintiff's account in that case. We have discussed already the absence of any necessary conflict between the witness statements and Harris's version of events. More important here, second-hand descriptions by police officers of the impressions of witnesses who heard but did not see the crucial events are a far cry from an authentic videotape that "depict[s] all of the defendant's conduct and all of the necessary context that would allow the [c]ourt to assess the reasonableness of that conduct," *Blaylock*, 504 F.3d at 414 (describing *Scott* video and distinguishing two police photographs). Affidavits that "offer[] some support for a governmental officer's version of events" are a routine feature of excessive force cases, and they do not justify a departure from the normal summary judgment standard. *Witt*, 633 F.3d at 276.

19

Pittman points to two other forms of evidence that he contends "blatantly contradict" Harris's account: DNA evidence indicating the presence of Harris's DNA on Pittman's gun; and post-altercation photographs showing bruises and scratches on Pittman's face, hands, and legs. But none of that evidence actually contradicts, blatantly or otherwise, Harris's crucial contention on summary judgment: that *after* a hand-to-hand struggle over Pittman's gun – which would account for Pittman's injuries, and during which Harris admits he reached for Pittman's gun, though he claims to have done so defensively – Pittman gained control over the weapon, used it to shoot Harris once in the chest, and *then*, after Harris fell to the ground badly wounded, stood over Harris and shot him twice more. Pittman's evidence, in other words, runs out at precisely the moment the parties' accounts critically diverge, and thus cannot establish that Pittman is entitled to summary judgment under *Scott v. Harris*. *See Witt*, 633 F.3d at 277 (declining to apply *Scott* to soundless video that "fails to capture seven important seconds of the incident, about which the parties' accounts decidedly differ").[3]

Finally, there is the last piece of evidence on which Pittman relies to show that the record "blatantly contradicts" Harris's version of events: the summary of facts accompanying Harris's state court *Alford* plea. After the events at issue here, Harris faced multiple charges in North Carolina, including one for assaulting a law enforcement

---

[3] Pittman also suggests that this DNA and photographic evidence contradicts some of Harris's earlier statements about the encounter, in which he denied touching Pittman's gun or engaging in an intense struggle with Pittman. Whether there are meaningful discrepancies between Harris's various accounts of events and, if so, what bearing they have on Harris's ultimate credibility, are questions to be assessed by a finder of fact.

officer (Pittman) with a firearm, and one for possession of a firearm (Pittman's gun) by a felon. Harris responded by entering an *Alford* plea, which allows a defendant to "proclaim[] he is innocent" but "intelligently conclude[] that his interests require entry of a guilty plea," where the "record before the judge contains strong evidence of actual guilt," *United States v. Davis*, 679 F.3d 177, 186 (4th Cir. 2012) (internal quotation marks omitted). The "distinguishing feature" of an *Alford* plea is that "the defendant does *not* confirm the factual basis" for his plea; the statement of facts accompanying an *Alford* plea is not intended to establish guilt but to "ensure merely that the plea is being intelligently entered." *United States v. Taylor*, 659 F.3d 339, 347 (4th Cir. 2011) (internal quotation marks and alteration omitted).

According to Pittman, the state prosecutor's summary of facts, to which Harris consented, "blatantly contradicts" Harris's critical assertion that he was lying on the ground when Pittman fired his final shots. It follows, Pittman concludes, that *Scott v. Harris* precludes a court from crediting Harris's account on summary judgment. Pittman cites no cases applying *Scott v. Harris* in this context, and we have found none. In any event, we cannot agree that the summary of facts that accompanied Harris's *Alford* plea "blatantly contradicts" Harris's account.

Not surprisingly, the prosecutor's summary focused on the facts underlying the actual charges against Harris, describing in detail the struggle for control of Pittman's weapon, Harris's temporary possession of the gun, and Harris's attempt to fire the gun point-blank at Pittman. The precise circumstances under which Pittman fired at Harris are the subject of less attention. According to the prosecutor, once Pittman took control

21

of his weapon, he was able to "discharge[] his firearm" at a then-standing Harris, after warning Harris to "get down." J.A. 168. The rest is a brief and undifferentiated account of Pittman's intentional shots: "The [o]fficer discharged his weapon striking the defendant multiple times" in the torso area and leg. J.A. 168–69. As the prosecutor explained, although there was "lots more evidence," his summary was intended to establish only what was material to the charges against Harris: that Harris "possessed [Pittman's firearm] for long enough to pull that weapon, pull that trigger." J.A. 169.

We discern no "blatant contradiction" between the prosecutor's summary of facts and the account Harris advances on summary judgment. Because they were not material to the charges against Harris, the state prosecutor did not dwell on the precise circumstances surrounding Pittman's final shots at Harris, the crux of Harris's § 1983 action. Most important, the prosecutor did not specify whether all of Pittman's shots were fired while Harris was standing, or only the first intentional shot – meaning that his account can be reconciled with Harris's, which also has Harris standing when the shooting begins. *See Witt*, 633 F.3d at 277 (declining to apply *Scott* to "ambiguous" evidence). Moreover, at the plea hearing, Harris's counsel noted for the record that Harris was disputing some of the details in the prosecutor's account. J.A. 171 (noting that Harris disputed "his actual possession or control over the firearm and some of the other instances relating to the struggle that did ensue"). Harris's plea colloquy thus does not foreclose his account of the critical events. And because there is no record evidence that "blatantly contradicts" Harris's account under *Scott*, we apply our normal summary

22

judgment standard for qualified immunity cases, "adopting . . . the plaintiff's version of the facts," *Witt*, 633 F.3d at 276 (quoting *Scott*, 550 U.S. at 378).[4]

In addition to his argument under *Scott*, Pittman offers an alternative justification for going beyond our mandate and refusing to adopt Harris's account in evaluating the reasonableness of Pittman's use of force: According to Pittman, doing so would require invalidating Harris's state court conviction, something a federal court may not do under *Heck v. Humphrey*, 512 U.S. 477 (1994). This argument – also raised for the first time on appeal – is without merit. Nothing about Harris's § 1983 suit calls into question his North Carolina judgment of conviction on charges of assaulting Officer Pittman while in possession of Pittman's gun. Harris would remain guilty on those charges even if Pittman were found to have used excessive force when he arrested Harris following Harris's commission of his crimes.

In sum, there is no ground in this case for departing from the standards that generally govern a motion for summary judgment based on a qualified immunity defense. As we explained in our prior ruling, those standards require a district court to view the facts in the light most favorable to the plaintiff and to draw all reasonable inferences in the plaintiff's favor. *Harris*, 668 F. App'x at 487. And although the district court assumed that the final shots were fired while Pittman was standing over Harris, in

---

[4] The parties also dispute whether Harris's *Alford* plea has preclusive effect in this § 1983 action, independent of Pittman's argument under *Scott v. Harris*. Because we find no conflict between the summary of facts accompanying Harris's *Alford* plea and Harris's account in this action, we need not resolve that question.

23

holding that Pittman's use of deadly force nevertheless was reasonable as a matter of law it drew a series of inferences in favor of Pittman, not Harris, and overlooked record evidence that could support Harris's claim.[5]  Accordingly, we find that the district court erred in granting summary judgment by failing to construe the evidence in the light most favorable to Harris.

## C.

Having determined that the district court erred in its analysis, we must now consider whether, construing the salient facts in the light most favorable to Harris, Pittman is entitled to qualified immunity as a matter of law.  Harris argues that when the record is viewed in the light most favorable to him, he can show that Pittman's final two shots, fired while Harris was lying on the ground wounded and unarmed, violated his Fourth Amendment rights, and that those rights were clearly established at the time of the incident.  We agree, and reverse the district court's contrary finding.

In assessing Pittman's qualified immunity defense, this court applies a familiar two-step inquiry.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Pearson v.*

---

[5] The district court also suggested that Harris had not produced competent evidence to support this part of his account because he relied on "unverified documents." J.A. 392.  In fact, Harris's opposition to Pittman's summary judgment motion was verified, and a party opposing summary judgment may rely on verified filings.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that courts treat verified pleadings as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge").  And our prior ruling, of course, was premised on the conclusion that Harris indeed had established a genuine dispute of fact as to "whether Harris was standing or lying down," requiring the district court to assume on remand "Harris was lying on the ground when Pittman, still on top of him, fired the final shots."  *Harris*, 668 F. App'x at 487.

24

*Callahan*, 555 U.S. 223, 236 (2009) (granting courts the discretion as to order in which two steps are addressed). At step one, we ask "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the police officer's actions violated a constitutional right." *Meyers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013). At step two, the question is whether the right at issue was "clearly established" at the time of the officer's conduct. *Id.* (quoting *Saucier*, 533 U.S. at 201).

We begin with the first prong, on which the district court primarily relied: whether Pittman's alleged conduct violated Harris's Fourth Amendment right to be free of excessive force in the making of an arrest. Harris claims that once he had been knocked to the ground with a gunshot wound to his chest, the justification for Pittman's initial shot – the threat posed to Pittman by Harris as they struggled for control of his weapon – was neutralized. At that point, he argues, a "reasonable officer" no longer "would have probable cause to believe that Harris posed a significant threat of death or serious physical injury," *Harris*, 668 F. App'x at 487 (citing *Garner*, 471 U.S. at 3, 11–12), rendering Pittman's final two shots objectively unreasonable and thus constitutionally excessive.

Viewing the record in the light most favorable to Harris, we think a reasonable jury could reach just that conclusion. We took the same view in *Waterman*, in which an extended highway chase ended with police officers firing a series of shots at the plaintiff's vehicle as it accelerated toward them and then passed them, killing the plaintiff. 393 F.3d at 473–75. The officers' initial shots, we held, were constitutionally justified, and no reasonable jury could find to the contrary: As the vehicle approached,

25

the officers had an objectively reasonable belief that it "posed an immediate threat of serious physical harm" to them. *Id.* at 477–79. But the situation changed, we reasoned, "mere seconds" later, once the vehicle passed the officers and the officers continued to fire after it. *Id.* at 480–82. At that point, the record evidence, viewed in the light most favorable to the plaintiff, would allow a reasonable jury to find that the officers "knew or should have known" that the plaintiff had passed them without veering in their direction, and that "any belief that the officers continued at that point to face an imminent threat of serious physical harm would be unreasonable." *Id.* at 482.

So too here. Harris does not dispute that Pittman's first intentional shot, fired when Pittman regained control of his weapon during a hand-to-hand struggle with Harris, was justified by an objectively reasonable belief that Harris posed a very serious threat to Pittman's safety. But on Harris's account, which we credit at this stage of the litigation, circumstances changed after that first shot, which struck Harris in the chest, "lift[ed] him off his feet," and threw him to the ground. J.A. 379. At that point, according to Harris, Pittman got to his feet and took aim at Harris, now lying on the ground wounded, unarmed, and "not trying to escape . . . [or] showing any further resistance," J.A. 329, before firing two more shots into his chest and the back of his leg. Viewing the evidence in the light most favorable to Harris – including Pittman's own statement that he had turned on his gun light, and evidence suggesting that Harris rolled onto his stomach before Pittman fired for the final time – a reasonable jury could find that Pittman "knew or should have known" that Harris no longer posed an imminent threat to his safety that justified the further use of deadly force. *Cf. Waterman*, 393 F.3d at 482.

26

And *Waterman* is not our last word on this subject. In *Brockington v. Boykins*, we applied *Waterman*'s logic to a situation closely resembling the one at issue here. That excessive force case, like this one, began with a confrontation between the plaintiff and a police officer, sufficiently serious that the plaintiff ultimately was convicted on criminal charges in state court – there, for kidnapping the officer. 637 F.3d at 504–05. And as in this case, the plaintiff did not dispute that when the officer fired on him initially, hitting him in his hand and his abdomen, that use of deadly force was justified. *Id.* at 507. The issue – just as here – was that the officer allegedly continued to shoot down at the plaintiff, even *after* the plaintiff, wounded by the initial shots, had fallen to the ground, unarmed. We affirmed the denial of the officer's motion to dismiss on qualified immunity grounds. That the officer's shots were all part of a single series, with the initial shots concededly justified, did not establish that the final shots were justified as well; instead, we found, "it is possible to parse the sequence of events as they occur." *Id.* Drawing all inferences in favor of the plaintiff, we reasoned, his account, if credited, would substantiate a Fourth Amendment violation: "There is no indication that deadly force was necessary or reasonable once [the plaintiff] was initially shot, thrown to the ground by the force of the bullets, and wounded." *Id.* (citing *Garner*, 471 U.S. at 9–11).

That analysis governs here. Accepting Harris's account and drawing all inferences in his favor, as we must, Pittman – just like the officer in *Brockington* – would have known that Harris was lying on the ground wounded and unarmed at the time of the final two shots. *See id.* ("drawing all inferences in favor of [the plaintiff]," it would have been apparent to the officer that the plaintiff was wounded and unarmed). And at that point,

27

"[r]ather than shoot [Harris] as he lay helpless on the ground, a reasonable police officer would have asked him to surrender, called for backup or an ambulance, or retreated," *id.* In sum, under *Brockington*, as well as *Waterman*, the facts alleged by Harris, taken in the light most favorable to him, would allow a reasonable jury to find a violation of his constitutional rights, satisfying the first prong of the qualified immunity analysis. *See Meyers*, 713 F.3d at 731.

That leaves us with the district court's alternative holding, under the second prong of the analysis: that even if Pittman could be found to have violated Harris's right to be free of excessive force, Pittman is entitled to qualified immunity because that right was not "clearly established" with sufficient specificity at the time of the incident. *See id.* We disagree.

The cases on which we rely above, laying out the rule that governs here, were decided in 2005 (*Waterman*) and 2011 (*Brockington*), before the 2012 events of this case. Since 2005, it has been established that "an imminent threat of serious physical harm to an officer is not sufficient to justify the employment of deadly force *seconds after the threat is eliminated* if a reasonable officer would have recognized when the force was employed that the threat no longer existed." *Waterman*, 393 F.3d at 482 (emphasis added). Six years later, in *Brockington*, we held that the *Waterman* rule was sufficiently specific to "clearly establish[]" the right of a suspect, once shot by an officer and lying wounded on the ground, not to be shot again. *Brockington*, 637 F.3d at 508. And although an exact factual match is not required to overcome a qualified immunity defense, *see Hope v. Pelzer*, 536 U.S. 730, 741 (2002), *Brockington* certainly comes

28

close: Under *Brockington*, it is clear that even a police officer who has just survived a harrowing encounter that necessitated the use of deadly force to extricate himself may not continue to use deadly force once he has reason to know that his would-be assailant is lying on the ground wounded and unarmed, 637 F.3d at 507–08. This is not a case, in other words, in which an officer would be required to reason backward from case law "at a high level of generality" to determine whether his conduct violated a constitutional right. *Cf. Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Here, "pre-existing law makes the unlawfulness" of the conduct in question – as alleged by Harris, and drawing all reasonable inferences in Harris's favor – "'apparent.'" *Clem*, 284 F.3d at 553 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[6]

In so holding, we are cognizant of the reality that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 397. This is a case in point; even on Harris's account, and certainly on Pittman's, Officer Pittman was faced with a genuine and no doubt

---

[6] In reaching the opposite result, the district court discussed neither *Waterman* nor *Brockington*. Instead, it relied on a series of cases involving suspects who were wounded or fallen but also armed or thought to be armed when the police continued shooting. *See* J.A. 395 (citing *Elliott*, 99 F.3d at 641, 644; *Maradiaga v. Wilson*, 518 F. Supp. 2d 760, 775 (D.S.C. 2007); and *Estate of Rodgers ex rel. Rodgers v. Smith*, 188 F. App'x 175, 183 (4th Cir. 2006)). But as we explained in *Brockington* itself, such cases – and we mentioned *Estate of Rodgers* specifically – do not govern where, as here, "[i]n drawing all inferences in favor of [the plaintiff], he was unarmed and this fact was apparent," so that the justification for the initial use of force had been eliminated. 637 F.3d at 507. Nothing about those cases, in other words, conflicts with *Waterman* or *Brockington*, or undermines the clarity of the rule those precedents establish.

terrifying threat to his safety during his struggle with Harris. We do no more today than reiterate what this court repeatedly has held: that even where deadly force initially is justified by a significant threat of death or serious physical injury, a police officer may not continue to employ deadly force when the circumstances change so as to eliminate the threat. Applying that principle to this case, we conclude that Pittman is not entitled to qualified immunity on summary judgment.

This conclusion, of course, does not mean that Harris "will prevail if the action is tried on the merits," *Jacobs*, 780 F.3d at 568 (internal quotation marks omitted). That decision is not ours – or the district court's – to make at this juncture. Instead, we hold only that there remain genuine disputes of material fact bearing on Pittman's qualified immunity defense, and that summary judgment therefore is not appropriate on this record.[7]

## III.

For the foregoing reasons, we reverse the judgment of the district court granting summary judgment and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[7] We note that Harris on several occasions moved in the district court for the appointment of counsel. In his informal brief before this court, Harris appealed the district court's denial of his most recent motion. Although Harris's counseled brief did not re-raise this issue, we encourage the district court on remand to consider appointing counsel for Harris to assist in the litigation of the case. *See Brooks v. Johnson*, ___ F.3d ___, 2019 WL 2063365, at *13 n.9 (4th Cir. May 10, 2019).

WILKINSON, Circuit Judge, dissenting:

This dispute began when Herman Harris fled from Officer Zachary Pittman, after repeatedly being told to stop. Pittman caught up to Harris at the edge of a tree line and both men fell many feet down into the woods. In the ensuing struggle, the suspect fought off a taser and repeatedly struck Pittman. As Harris later admitted in a guilty plea for this assault, he tried to shoot Pittman in the head with Pittman's gun. Both men sustained serious injuries. When the altercation ended, Officer Pittman's face was lacerated, his hands were bleeding, taser wire covered the forest floor, and parts of Pittman's uniform and gun holster were destroyed. Harris was shot multiple times. Only a few minutes passed between the time that Officer Pittman first announced his presence and the time he emerged injured from the woods.

The majority shaves this incident oh so fine, parsing and segmenting the encounter almost second by second, ultimately finding that Pittman's efforts to save his life in the final moments of the altercation were excessive. Sadly for the majority, the action here spun by; the struggle allowed the combatants no time for a coffee break. In the majority's view, if a suspect lands a punch in one moment, drags you to the ground the next, and goes for your gun a second later, a reasonable officer must shed any attempt to preserve his own life if, in the course of the ongoing fight, the officer gains so much as a fleeting advantage.

It was much to be hoped that the majority would understand the difference between a struggle in which life and death hinged on an instant and the leisured contemplation brought to events years later. To the best of my knowledge, the majority

31

was not present at the scene. The majority was not tumbling down a wooded ravine in the dark of night. The majority was not alone, fighting a person who had disregarded clear warnings, fled arrest, fought through a taser, and tried to grab its gun. The majority did not struggle to regain its weapon while lying beaten and bloodied on the ground. And the majority did not fear for its life when that weapon was ultimately used to stop the assault. The law of qualified immunity does not allow us to ignore the serious and ongoing threat faced by Officer Pittman. Although I may never understand the risks that officers face in the service of public safety, settled law requires that I try. Because I cannot see how Pittman's actions were in any way unreasonable, I respectfully dissent.

## I.

My esteemed colleagues in the majority are surely right in one respect. Police officers do overreach. And when they do, the law must hold them to account. This court's decision in *United States v. Slager*, decided only a few months ago, makes it clear beyond question that police officers cannot apply force, and certainly not unreasonable force, in response to every provocation. 912 F.3d 224, 237 (4th Cir. 2019). Officer Slager badly abused his authority by firing on a fleeing suspect and then lying about it afterwards. The law imposed its consequences. Qualified immunity, however, provides officers the "breathing room to make reasonable but mistaken judgments." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011)). In other words, an officer may employ force in a fraught situation to forestall a deadly threat. That is all Officer Pittman did.

Four years ago, the Supreme Court noted how often it is called upon to reverse federal courts that deny qualified immunity in excessive force cases: "Because of the importance of qualified immunity 'to society as a whole,' the Court often corrects lower courts when they wrongly subject individual officers to liability." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 n.3 (2015) (collecting cases) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

The Court's view on the importance of qualified immunity has not wavered. Each year, it has continued to issue opinions, often per curiam, reversing a denial of qualified immunity in an excessive force suit. *See, e.g.*, *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (per curiam); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curiam); *White v. Pauly*, 137 S. Ct. 548 (2017) (per curiam); *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (per curiam). In some cases, lower courts erred by defining the constitutional right at such a high level of abstraction that no conduct whatsoever was protected by the immunity. *See, e.g., Mullenix*, 136 S. Ct. at 308. At other times, courts have erred in applying the immunity standard, either by assessing the officer's conduct without regard to the facts on the ground, *see, e.g.*, *Kisela*, 138 S. Ct. at 1153, or wrongfully finding a "genuine" dispute of fact, *see, e.g., Scott v. Harris*, 550 U.S. 372 (2007). The Supreme Court has been forced into the fray to prevent the total erosion of qualified immunity.

At some point a pattern of Court decisions becomes a drumbeat, leaving one to wonder how long it will take for the Court's message to break through. Perhaps the Court's patience on this point is endless, because, golly, it has been so sorely tried. The failings that have been so routinely documented by the Supreme Court rear their head

33

once again. The majority has used the summary judgment standard once more to eviscerate qualified immunity protections. In the majority's hands, every dispute becomes genuine and every fact becomes material. Qualified immunity fades to the end of every discussion, its values reserved for lip service until little enough is left. The result? The majority has ignored Supreme Court precedent, somehow finding Pittman's actions to save his own life something our Constitution cannot condone.


II.

This case comes to us at the summary judgment stage and a suit can only proceed if some material fact is "genuinely" disputed. Although it may not be clear from reading the majority opinion, awards of pre-trial dismissals are crucial to the utility of any immunity. The Supreme Court has repeatedly emphasized that qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). If a case goes to trial when a valid basis for summary judgment exists, the entire purpose of the immunity is thwarted. The majority belies all of this teaching in repeatedly referring to this case as at an "early stage of the litigation," Maj. Op. at 10, thereby betraying its view that these sorts of cases should be resolved at a later, rather than earlier, point in time. But the more litigation the merrier is not at all what qualified immunity is about.

The majority portrays this case as a one-on-one swearing contest between Harris and Pittman, but it is hardly that. My colleagues here are willing to rest their decision on

34

a conclusory version of the facts offered by Harris, which is not only unsupported by the whole record, but flatly contradicted by it. Controlling precedent, however, simply does not allow the majority to turn a blind eye to the stark weaknesses in the plaintiff's claim. The requirement that there be a "genuine" dispute to get to trial should not be too high a barrier for plaintiffs, but it should not be an open door either. Harris has not done nearly enough to show a "genuine" dispute in this case, and his version of events should be rejected.

Many of the facts offered by Officer Pittman are not disputed. Given that Harris offered very few facts of his own and previously pled guilty in state court to assaulting Officer Pittman, this is unsurprising. The parties agree that Harris fled after Pittman told him to stop, jumping a fence and ignoring multiple warnings. They also agree that the parties were engaged in a violent ground altercation, that there was a struggle for Pittman's gun, and that the first gunshot that struck Harris in the torso was fired in the course of the fight. Opening Br. at 3-4; Resp. Br. at 4-8. The majority acknowledges this broad agreement between the parties, which demonstrates beyond any doubt that Officer Pittman was involved in an incident that might well have taken his life. Maj. Op. at 3-4.

The parties' accounts diverge on what happened in the final seconds of the fight, when the last shots were fired. Pittman alleges that he fired all of the shots in quick succession while Harris was standing over him, after telling him to get down. On his view, he was lying on the ground, physically exhausted and wounded, facing a suspect who was much larger than himself and who had just attempted to shoot him in the head with his own gun. We do not, of course, simply take Pittman's word for it. But Pittman's

35

account of events not only comes from his own statement, but also has ample support in the record, including forensic evidence, witness statements, and photos taken at the crime scene. It is also consistent with the facts that Harris already accepted in his earlier state court plea. For his part, Harris alleges that Pittman fired on him once he fell to the ground, after he was already incapacitated by the earlier shot. Harris offers only his own affidavit to support his version of the facts.

The Supreme Court's decision in *Scott v. Harris* tees up this case perfectly. 550 U.S. 372 (2007). In *Scott*, the Court was also confronted by two wildly divergent accounts of the facts, one of which was provided by a plaintiff who offered no more than his own affidavit to support his claim. Even though the facts of the case were disputed at the summary judgment stage, the Court noted that what mattered was whether the dispute was "genuine," not merely contested. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

The majority abruptly dismisses *Scott*, terming it an "exception, not the rule." Maj. Op. at 18. But the Court in *Scott* had in mind an affidavit just like the one submitted by Harris, which offers little more than conclusory assertions and wild accusations. Harris at various times accuses the police (without support) of falsifying DNA evidence and lying about which officers were at the scene. J.A. 51, 57. He then asserts that he never grabbed Officer Pittman's gun and never initiated contact with him. *Id.* at 43. And most critically, he alleges that the final shots were fired long after he fell to the ground. *Id.* at 41-43.

36

Harris's view may fit well with the prevailing social discourse, but it does not fit at all with the evidence. Unfortunately for my majority colleagues, who casually accept Harris's affidavit full stop, the record in this case undermines his story at nearly every turn. Harris's DNA was found on Pittman's weapon, belying any claim that he never grabbed the gun. J.A. 303-304. Forensic evidence demonstrates that the gunshot that injured Harris' hand was fired while the gun was holstered, further showing that he was grabbing for the weapon during the fight. *Id.* at 62, 252. Witnesses who heard the encounter recalled hearing a single shot, followed later by a series of shots fired in rapid succession. *Id.* at 59. This stands in stark contrast with Harris' contention that the second shot was followed by a long pause, such that Pittman would know for sure that Harris no longer posed a threat.

As if this evidence from the scene were not enough, Harris, in the course of pleading guilty to assaulting Pittman, admitted in state court that he fought over the gun. In fact, he admitted trying to shoot Pittman in the head, and only failing because the gun misfired in the holster. J.A. 169. He also admitted in his plea proceedings to hearing "get down, get down" in the moments before the final shots, demonstrating that he was still standing at the time. *Id.* at 168. There is simply no way that a reasonable juror could look at an account so devoid of independent factual development, so full of unsupported accusations, and so weakened by blatant contradiction in the record and walk away with the sense that Harris's version of events is accurate, or in any way compelling. *Scott* recognizes that while the non-moving party's burden of showing a "genuine" dispute is not an onerous one, it cannot rest solely on such a flimsy foundation. Without additional

support in the record, the decision in *Scott* requires that we adopt the version of events that is supported by objective record evidence.

By this objective standard, taken not just from Pittman's account but from the record in its entirety, Pittman's actions were altogether reasonable. He fired on Harris while Harris was standing over him during an ongoing violent altercation. Moments earlier, his life was only spared by a misfiring gun. This court has never suggested that an officer is forbidden from taking action, including lethal action, to save his own life in such a situation. To the contrary, it is clearly established that he may do exactly that. *See White*, 137 S. Ct. at 550; *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

The majority finds otherwise only by looking to cases far afield from the facts actually faced by Officer Pittman. To be sure, there are prior cases in this circuit in which a use of force was reasonable one moment but was unreasonable in the next. *See Brockington v. Boykins*, 637 F.3d 503 (4th Cir. 2011); *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005). From these cases it is evident that, as a general matter, an officer's use of force must be examined at the moment it takes place. The district court did not disagree with that proposition, nor do I. What mattered in our prior cases, however, and what ought to matter here, is whether the risk facing the officer was still present when force was used. In *Waterman*, officers continued to fire on a car after the "vehicle passed the officers," 393 F.3d at 480, while the officer in *Brockington* fired additional gunshots after the plaintiff "fell off the porch onto the concrete backyard below," 637 F.3d at 507. Neither case bears any resemblance to the one here. In this case, Pittman was in an isolated patch on a dark night. He was indisputably facing a man who had struggled to

38

grab his weapon, sought by his own admission to shoot him in the head, fought through taser wire, ignored an order to "get down, get down," and had earlier disregarded clear warnings to stop. There was no break in the action. Pittman could well and reasonably believe that he was faced with a mortal threat and he was permitted to respond accordingly.

It may be that one day this court will openly announce what is implicit here: a rule of constitutional law that subjects a police officer to liability for trying to save his life. I rather doubt, however, that our founding document forces officers to play roulette with their own existence. All we have ever needed to resolve this case is the recognition that no such unfeeling rule currently exists. Qualified immunity shields all but those are "plainly incompetent or . . . knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and Officer Pittman is clearly not deserving of either label. He has violated no clearly established right, or any other right for that matter, and he is entitled to immunity.

III.

Interactions between citizens and police continue on edge, and minority communities and neighborhoods have justly felt that race brings with it an unwarranted presumption of wrongdoing. The Fourth Amendment, invaluable as it is, is but an imperfect check on the invisible hand of discriminatory enforcement. These grievances are now rightly garnering increased attention, but attention to one side of a fraught equation raises the risk that the other side will be neglected.

And there is another side. "Nationwide, interest in becoming a police officer is down significantly." *See* Tom Jackman, Who Wants to be a Police Officer? Job Applications Plummet at Most U.S. Departments: Perceptions of Policing, Healthy Economy Contribute to Decreased Applications at 66 Percent of Departments, Wash. Post (Dec. 4, 2018) ("Recently, [Chuck Wexler, head of the Police Executive Research Forum,] asked a roomful of chiefs to raise their hands if they wanted their children to follow them into a law enforcement career. Not one hand went up."). While this drop has many causes, unwarranted disrespect for the police profession is surely one.

Police work, like the calling of many a skilled tradesman, has often been handed down through the generations in America, but self respect depends in part upon societal respect, and that for officers is sadly ebbing. Court decisions that devalue not only police work but the very safety of officers themselves risk severing those bonds of generational transmission that have so sustained the working classes of our country. It is a shame, because professional police work helps to bridge the gulf between the haves and have nots in a community and protects our most vulnerable and dispossessed populations. Law must sanction officers who would abuse their power or disregard controlling law; it should not scare off those who worry that no matter what they do or whom they protect, they cannot avoid suits for money damages.

When Officer Pittman emerged from that tree line, "gasping for air and . . . in physical pain," J.A. 250, he ought to have been greeted with respect. Instead he has been pulled from one fight and thrust into another, this time in a courtroom. The district court in this case applied our precedent faithfully and the officer here showed conspicuous

40

courage. I cannot join a decision that engineers such a perverse punishment for his actions and tells future officers that they cannot preserve their very lives without having their conduct assessed through the uncomprehending lens of hindsight.

The second-guessing will have no end. If not now, never.